859 A.2d 1025

**CSX TRANSPORTATION, INC.**

v.

**Donald E. MILLER.**

**No. 1142, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Oct. 1, 2004.

124

Stephen B. Caplis (Amy E. Askew, Whiteford, Taylor & Preston, LLP on the brief), Baltimore, for Appellant.

C. Richard Cranwell (H. Keith Moore, Cranwell, Moore & Bullington on the brief), Roanoke, VA. (Guy M. Albertini, Theresa A. Rosendale, Albertini, Singleton, Gendler & Darby on the brief), Baltimore, for Appellee.

Panel: SONNER *, SHARER, CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge, retired, specially assigned.

## The A, B, C's of Where We Are

This appeal is from a plaintiff's verdict in a Federal Employers' Liability Act ("FELA") case. That statement may be self-explanatory to the small handful of practitioners who labor regularly, or even occasionally, in that very specialized vineyard. One strongly suspects, however, that many who speak of FELA law with breezy familiarity are only whistling past the graveyard. To the more modest vast majority of the bar (and the bench), a FELA case is essentially, if not totally, *terra incognita.*[1] For those suddenly cast ashore on that

---

* Sonner, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

1. Since the Supreme Court in *Davis v. Baltimore & Ohio Railroad Co.,* 379 U.S. 671, 85 S.Ct. 636, 13 L.Ed.2d 594 (1965), reversed *Baltimore & Ohio Railroad Co. v. Davis,* 235 Md. 568, 202 A.2d 348 (1964), on the issue of the sufficiency of the evidence of negligence to take a FELA case to the jury, only a scant handful of reported Maryland decisions have even mentioned the FELA. Almost every one of those, moreover, has only had to deal with the FELA in the most oblique and passing of ways.

 Most recently, *Haischer v. CSX Transportation, Inc.,* 381 Md. 119, 848 A.2d 620 (2004), affirmed in part and reversed in part the decision of this Court in *CSX Transportation, Inc. v. Haischer,* 151 Md.App. 147, 824 A.2d 966 (2003). The primary issue in that case, however, was the applicability of the collateral source rule, to bar the admissibility of evidence, on the issue of damages, that the plaintiff was receiving pension benefits from the railroad.

exotic coast, it may be prudent, before plunging into the interior, to spend a few pages looking about and getting one's bearings.

## A. A FELA Suit Is a Hybrid

The FELA law is a hybrid. It hovers ambivalently between workers' compensation law and the common law tort of negligence. It is neither, but it partakes of characteristics of both.

The FELA was, from its birth, a narrow solution to a narrow problem. The cause of action is very restrictive in its coverage, in terms of both defendants and plaintiffs. The only possible defendants are railroads engaged in interstate commerce. The only possible plaintiffs are the employees of those railroads who are injured on the job. The very title of the law, Federal Employers' Liability Act, is confusingly overbroad. As Reginald Parker, "FELA or Uniform Compensation for All Workers," 18 *Law and Contemporary Problems* (Duke University School of Law, 1953) (hereinafter "Parker") 208 n. 3, pointed out:

> *The title of the FELA is misleading. It is not a "federal employer" law but a [federal] law pertaining to employers; and it does not pertain to "employers" as such,* either, because *it merely applies to railroads.*

(Emphasis supplied).

The approach taken by Congress in 1906 and 1908 was, by today's standards, strangely *ad hoc,* restricting the remedy to railroad workers alone. In 1920, the Congress was similarly *ad hoc* in passing the Jones Act, now codified as 46 U.S.C. §§ 688 *et. seq.,* which gave to seamen in interstate commerce the same rights given to railroad employees by the FELA. *Kernan v. American Dredging Co.,* 355 U.S. 426, 429–33, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). Other long distance transportation employees, apparently because they were later to come onto the field, such as airline employees and interstate bus line employees were left uncovered by the FELA or the Jones Act or any similar act. Even railway express employees and Pullman car porters, for reasons largely lost in the mists, were

not covered. *Wells Fargo & Co. v. Taylor,* 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205 (1920); *Robinson v. Baltimore & O.R.R. Co.,* 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849 (1915). The FELA is, indeed, narrow in its focus.

The two-decade-long reform movement that culminated in the passage by Congress of the first FELA in 1906 was concerned with a type of social problem that, in the immediately ensuing decades, began to be addressed, at both state and federal levels, by the passage of workers' compensation laws. In 1906, however, workers' compensation was not yet a realistically viable option. Parker, at 215, has explained:

> *To leave injured railway workers to state workmen's compensation . . . was not possible in 1906 and 1908 when but few states had workmen's compensation laws, whose constitutional validity was considered dubious.*

(Emphasis supplied).

By contrast, Congress was already looking favorably on workers' compensation laws by 1916, when it passed the Federal Employees' Compensation Act, 5 U.S.C. §§ 751 *et seq.,* and by 1927, when it passed the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.,* as bona fide workers' compensation statutes. See *Calbeck v. Travelers Insurance Co.,* 370 U.S. 114, 117–22, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962); *Stanley v. Western Maryland Ry. Co.,* 301 Md. 204, 207–08, 482 A.2d 881 (1984).

The impetus for the FELA was that throughout the 1870's, 80's, and 90's, thousands of railroad workers were being killed and tens of thousands were being maimed annually in what came to be increasingly seen as a national tragedy, if not a national scandal. In concurrence in *Wilkerson v. McCarthy,* 336 U.S. 53, 68, 69 S.Ct. 413, 93 L.Ed. 497 (1949), Justice Douglas paraphrased President Theodore Roosevelt, a staunch and early champion of the FELA, in declaring that a national law was needed that "was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations." In *Consolidated Rail Corporation v. Gottshall,* 512 U.S. 532, 542, 114 S.Ct. 2396, 129

L.Ed.2d 427 (1994), the Supreme Court referred to the FELA's energizing purpose:

> Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted *a federal remedy that shifted part of the " 'human overhead' " of doing business from employees to their employers.*

(Emphasis supplied).

Justice Brennan, in *Kernan v. American Dredging Co., supra,* 355 U.S. at 431–32, 78 S.Ct. 394, described the FELA as a recognition that the railroad industry was better able to shoulder the cost of industrial injuries and deaths than were injured workers or their families:

> [I]t came to be recognized that, *whatever the rights and duties among persons generally, the industrial employer had a special responsibility toward his workers,* who were daily exposed to the risks of the business and who were largely helpless to provide adequately for their own safety. Therefore, *as industry and commerce became sufficiently strong to bear the burden, the law,* the reflection of an evolving public policy, *came to favor compensation of employees and their dependents for the losses occasioned by the inevitable deaths and injuries of industrial employment,* thus shifting to industry the "human overhead" of doing business. For most industries this change has been embodied in Workmen's Compensation Acts. In the railroad and shipping industries, however, the FELA and Jones Act provide the framework for determining liability for industrial accidents.

(Emphasis supplied).

Thus, although the FELA is not a workers' compensation act, the social forces that produced it and the generating spirit that drives it resonate with the language and philosophy of workers' compensation principles.

## B. The Enactment, and Reenactment, of the FELA

Twenty years of labor agitation and social reform, cheered on by the bully trumpeting of the sitting president, created the hydraulic groundswell that produced the first FELA in 1906. It subjected railroads to suits by injured employees. In January of 1908, however, the Supreme Court, in *Howard v. Illinois Central R.R.*, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297 (1908), struck down the act as unconstitutional for not having adequately confined the law to situations implicating interstate commerce. Congress, urged on by President Roosevelt, responded within three months by reenacting the FELA, now adequately confined to interstate commerce.

The reenacted FELA of 1908 is now codified as 45 United States Code Annotated, §§ 51 through 60. The heart of the act is spelled out by § 51, which provides in pertinent part:

> *Every* common carrier by *railroad* while engaging in commerce between any of the several States ... *shall be liable in damages to any person suffering injury while he is employed by such carrier* in such commerce, or, in case of the death of such employee, to his or her personal representative ... *for such injury or death resulting in whole or in part from the negligence of* any of the officers, agents, or employees of *such carrier*, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

(Emphasis supplied).

A FELA claim may be brought in state or federal court. 45 U.S.C. § 56 provides, in pertinent part:

> The jurisdiction of the courts of the United States under this chapter shall be concurrent with that of the courts of the several States.

*St. Louis Southwestern Railway Company v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985), further provides:

As a general matter, FELA cases adjudicated in state courts are subject to state procedural rules, but the substantive law governing them is federal.

Dan B. Dobbs, 1 *The Law of Torts* (2001), 312, briefly describes the FELA:

*The FELA creates a federal claim on behalf of railroad workers injured on the job.* The statute abolishes the defenses of contributory negligence and assumed risk and is interpreted to impose a liberal view of fault and causation that makes recovery relatively easy. *Were there no such statutes, the railroad employees would ordinarily be limited to state tort law claims or workers' compensation payments* for on the job injury or would be subject to defenses like contributory negligence and assumed risk. Although FELA cases are still negligence cases in the sense that negligence is an issue, some of the rules of conduct and litigation are different.

(Emphasis supplied).

**C. The FELA Is Not a Workers' Compensation Law**

Because the FELA does not impose on the railroads tort liability for injuries inflicted on the public generally, but is confined to liability for injuries suffered by employees in the course of their employment, it bears a strong resemblance to workers' compensation laws. It is not such, however. In *Consolidated Rail Corporation v. Gottshall, supra,* 512 U.S. at 543, 114 S.Ct. 2396, the Supreme Court made that very clear:

*That FELA is to be liberally construed,* however, *does not mean that it is a workers' compensation statute.* We have insisted that FELA "does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur."

(Emphasis supplied).

John M. Ennis, "An Analysis of Judicial Interpretation and Application of Certain Aspects of the Federal Employers Liability Act," 18 *Law and Contemporary Problems* (Duke

University School of Law, 1953) (hereinafter "Ennis"), 350, similarly observed:

> *The first thing that should be emphasized about the Federal Employers' Liability Act is that it is not in the nature of a workmen's compensation law, but is in fact a special federal negligence law* which gives the right to most of the employees of the railroads to bring a negligence action against their employer for personal injuries suffered while on the job.

(Emphasis supplied).

For railroad employees, there are both advantages and disadvantages to being covered, in terms of industrial injuries or occupational diseases, by something other than workers' compensation law. On the downside, it is, to be sure, more difficult to establish a provable claim. Ennis, at 350, points out:

> [I]f there are no facts which indicated negligence on the part of the railroad, the employee has no right under the Act which can be successfully prosecuted. There are situations where a man is injured through no apparent fault of his own and yet there cannot be shown any negligence on the part of the carrier. *Such an injured railroad employee is indeed unfortunate because he does not have recourse to any state workmen's compensation law and there is no federal compensation law to cover him,* so that he is in the position of having no remedy in any form for his injuries and damages, and if he is killed his widow is in a sad situation legally as well as personally.

(Emphasis supplied).

On the upside, the courts look with favor on FELA suits and the rewards for a successful plaintiff are invariably higher than would be the case with a workers' compensation award. Parker, at 210, observes:

> This mode of legislation has created a friendly atmosphere toward injured railroad workers in the courts, both state and federal. ... *Verdicts are high, probably higher than they would be in ordinary tort suits for similar*

*injuries.* And it need not be emphasized that, stripped of their most powerful common-law defenses, particularly contributory negligence and assumption of risk, *the defendant railroads under the FELA have less of a chance to prevail than ordinary defendants in negligence suits.*

(Emphasis supplied). In the present case, for instance, the jury award to the plaintiff was for $1,500,000. Not many workers' compensation awards would ever reach that figure for an osteoarthritic left knee.

## D. A FELA Suit For Negligence Is Not the Common Law Tort of Negligence

■ A FELA suit can be successfully pursued by an employee only if there is proof of some negligence on the part of the railroad. *Ellis v. Union Pacific R. Co.,* 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572 (1947), is very clear:

The Act does not make the employer the insurer of the safety of his employees while they are on duty. *The basis of* his *liability is* his *negligence,* not the fact that injuries occur. And that negligence must be "in whole or in part" the cause of the injury.

(Emphasis supplied).

The negligence that must be shown in a FELA action, however, is but a pale reflection of common law negligence. As was pointed out by the Supreme Court in *Rogers v. Missouri Pacific Railroad Co.,* 352 U.S. 500, 509–10, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), "the special features of this statutory negligence action ... make it significantly different from the ordinary common law negligence action." As Parker explains, at 208–09, the FELA was a statute that modified the tort law in the case of a railroad's duty to its employees.

*[I]t is a statute modifying the duties under tort law of railroads toward their employees.* Under the common law of torts, the master is liable to his servants for negligence, particularly in providing them with a safe place to work as well as with safe tools, and has a duty to help them when in peril. These duties, however, are or at least were subject to

considerable restrictions, which made the lot of the worker in common-law countries somewhat less desirable than that of his brethren under the civil law. His negligence suit against the employer is or was open to the defense of his contributory negligence, which was not hard to adduce; after all, it can nearly always be said that with greater care the employee could have avoided an accident that occurred under circumstances over which he was likely to have greater control than his master. And if he was not contributorily negligent, the easily proved fact that he had "assumed" the risks of his employment stood up as another defense against his claim. Furthermore, even if the servant had neither carelessly contributed to nor assumed the dangers that brought about his accident, the fault of a fellow servant could be used under a particularly harsh doctrine in order to defeat the tort action. . . .

· *The FELA,* as amended, *has done away with the defense of contributory negligence* as we know it and replaced it by comparative negligence of maritime and European civil law, which works merely in mitigation of damages. *It has completely abolished the fellow servant doctrine,* which means that *respondeat superior is applicable and the railroad is liable regardless of who within the scope of his railroad employment caused the accident. Assumption of risk is no longer a defense, not even in mitigation of damages.*

(Emphasis supplied).

## 1. Negligence Is a Substantive and Federal Question

*Urie v. Thompson,* 337 U.S. 163, 174, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), squarely held that the existence of negligence under the FELA is a question of federal law and not of state law:

*What constitutes negligence for the statute's purposes is a federal question,* not varying in accordance with the differing conceptions of negligence applicable under state and

local laws for other purposes. Federal decisional law formulating and applying the concept governs.

(Emphasis supplied).

## 2. Elimination of Contributory Negligence As a Defense; Elimination of the "Fellow Servant" Defense

As early as 1908, the FELA eliminated contributory negligence as a bar to a finding of liability. Section 53 of the act provides, in pertinent part.

> In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, *the fact that the employee may have been guilty of contributory negligence shall not bar a recovery.*

(Emphasis supplied). The original act also "abolished the employer's 'fellow servant' defense." *Consolidated Rail Corporation v. Gottshall, supra,* 512 U.S. at 560 n. 2, 114 S.Ct. 2396.

## 3. Elimination of Assumption of Risk As a Defense

A number of Congressional amendments made the FELA even more plaintiff-friendly in 1939. Among them was the elimination of the defense of assumption of risk. Section 54 of the Act now provides, in pertinent part:

> In any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to, or the death of, any of its employees, *such employee shall not be held to have assumed the risks of his employment* in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.

(Emphasis supplied). *Tiller v. Atlantic Coast Line R. Co.,* 318 U.S. 54, 58, 63 S.Ct. 444, 87 L.Ed. 610 (1943), added an exclamation point to the 1939 amendment:

*We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 Amendment,* and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open the identical defense for the master by changing its name to "non-negligence."

(Emphasis supplied).

### 4. Watering Down the Proof of Negligence

Yet another strongly plaintiff-friendly departure of the FELA from common law negligence actions is that if the railroad is guilty of any violation of the Safety Appliance Acts, 45 U.S.C. §§ 1 *et seq.,* or the Boiler Inspection Act, 45 U.S.C. §§ 22 *et seq.,* that contributes in any way to the injury, the employee is relieved of any further burden of proving negligence on the part of the railroad. The employee has the benefit of "the legislative intent to treat a violation of the safety appliance act as 'negligence,'—what is sometimes called negligence *per se." Urie v. Thompson, supra,* 337 U.S. at 189, 69 S.Ct. 1018. As *Urie v. Thompson* further explained:

[T]he Safety Appliance Acts, together with the Boiler Inspection Act, are substantively if not in form amendments to the Federal Employers' Liability Act. *They dispense,* for the purposes of employees' suits, *with the necessity of proving that violations of the safety statutes constitute negligence;* and *making proof of such violations is effective to show negligence as a matter of law.* ... [T]he Boiler Inspection and Safety Appliance Acts cannot be regarded as statutes wholly separate from and independent of the Federal Employers' Liability Act. They are rather supplemental to it, *having the purpose and effect of facilitating employee recovery, not of restricting such recovery or making it impossible.*

337 U.S. at 189, 69 S.Ct. 1018 (emphasis supplied).

When the basis for the FELA liability is a violation of the Boiler Inspection Act or the Safety Appliance Acts, nothing more in the way of negligence need be shown. *Lilly v.*

*Grand Trunk W.R.R. Co.,* 317 U.S. 481, 485–86, 63 S.Ct. 347, 87 L.Ed. 411 (1943), explained:

> *Negligence is not the basis for liability under the Act.* Instead it *"imposes upon the carrier an absolute and continuing duty* to maintain the locomotive, and all parts and appurtenances thereof, in proper condition, and safe to operate in active service without unnecessary peril to life or limb."

\* \* \*

> *The Act . . . is to be liberally construed in the light of its prime purpose, the protection of employees* and others by requiring the use of safe equipment.

(Emphasis supplied). And see *Haischer v. CSX Transportation, Inc.,* 381 Md. 119, 125–28, 848 A.2d 620 (2004); *CSX Transportation, Inc. v. Haischer,* 151 Md.App. 147, 154–56, 824 A.2d 966 (2003).

Parker, at 209, has characterized the impact of this departure from what would otherwise be the problem of proving negligence:

> Finally, the Safety Appliance Acts as interpreted by the courts have established the rule that *any violation of these acts,* or of any regulation issued thereunder, *imposes absolute liability on the railroad.* The problem of negligence may not be raised and it is error to charge the jury with the question in safety appliance cases. *The scope of this rule is very far-reaching and at times bring the FELA into the close vicinity of an insurance law or, in other words, of workmen's compensation.* Once the failure to work properly of a safety appliance . . . is shown there remains only the question of causation.

(Emphasis supplied).

*Kernan v. American Dredging Co., supra,* also observed.

> *[L]iability was created without regard to negligence* under the line of decisions of this Court in actions under the

FELA based upon violations of either the Safety Appliance Acts or the Boiler Inspection Act.

355 U.S. at 430, 78 S.Ct. 394 (emphasis supplied).

A violation of a statutory duty, moreover, is interpreted more liberally in favor of the plaintiff in a FELA action than would be the case under traditional tort law. *Kernan v. American Dredging Co., supra*, outlines this difference:

> The tort doctrine imposes liability for violation of a statutory duty only where the injury is one which the statute was designed to prevent. However, *this Court has repeatedly refused to apply such a limiting doctrine in FELA cases.*

355 U.S. at 432, 78 S.Ct. 394 (emphasis supplied).

## 5. Watering Down the Proof of Causation

Quite aside from the watering down of the proof of negligence, the FELA also involves a significant watering down of the proof of causation. In *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the Supreme Court was very clear.

> [T]he test of a jury case is simply *whether* the proofs justify with reason the conclusion *that employer negligence played any part, even the slightest, in producing the injury* or death for which damages are sought. *It does not matter that,* from the evidence, *the jury may also* with reason, on grounds of probability, *attribute the result to other causes.*

(Emphasis supplied).

In *Consolidated Rail Corp. v. Gottshall, supra*, the Supreme Court reaffirmed:

> We have liberally construed FELA to further Congress' remedial goal. *[A] relaxed standard of causation applies under FELA.* We stated that "[u]nder this statute the test of a jury case is simply *whether* the proofs justify with reason the conclusion that *employer negligence played any*

*part, even the slightest,* in producing the injury or death for which damages are sought.

512 U.S. at 543, 114 S.Ct. 2396 (emphasis supplied).

Ennis, at 351, also speaks to this lowering of the bar as the plaintiff undertakes to prove causation.

[T]he railroad is responsible and shall be liable in damages for injuries or death resulting in whole or *in part* from the negligence of any of its agents or insufficiency in its equipment, etc. *The important words here are "in part."* This means that, *while the injured man's employer may be only slightly negligent in a small part of the entire picture of negligence, nevertheless, the carrier is responsible under the Act and can be made responsible in damages.*

(Emphasis supplied).

### 6. The Departure From Tort Law Generally

In *Atchison, Topeka and Santa Fe Railway Co. v. Buell,* 480 U.S. 557, 561, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987), Justice Stevens underscored the FELA's purpose to modify the common law tort of negligence by eliminating a number of the traditional defenses.

In 1906, Congress enacted the FELA to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer or their fellow employees. *A primary purpose of the Act was to eliminate a number of traditional defenses to tort liability and to facilitate recovery* in meritorious cases. *The Act expressly prohibits covered carriers from adopting any regulation, or entering into any contract, to limit their FELA liability.*

(Emphasis supplied). *Consolidated Rail Corp. v. Gottshall, supra,* 512 U.S. at 542–43, 114 S.Ct. 2396, spoke to the same effect:

In order to further FELA's humanitarian purposes, *Congress did away with several common-law tort defenses that had effectively barred recovery by injured workers.* Specifically, *the statute abolished the fellow servant rule, rejected the doctrine of contributory negligence* in favor of that of

comparative negligence, *and prohibited employers from exempting themselves from FELA through contract; a 1939 amendment abolished the assumption of risk defense.*

(Emphasis supplied).

### E. The Explanation For FELA's Departure From Common Law Negligence

A cause of action that keeps one foot doggedly rooted in negligence but stretches almost all the way to workers' compensation may seem bizarre. The Supreme Court, however, has explained how deeper tectonic forces produce, over time, otherwise inexplicable surface shifts. Justice Brennan in *Kernan v. American Dredging Co., supra,* described the undergirding social and economic changes that underlay the movement away from a common law tort with numerous defenses to a mere shadow of a tort that eerily resembles a workers' compensation statute. As a recognized, even if unspoken, policy, the common law tort defenses were intended to protect the employer.

> It is true that at common law the liability of the master to his servant was founded wholly on tort rules of general applicability and the master was granted the effective defenses of assumption of risk and contributory negligence. *This limited liability derived from a public policy, designed to give maximum freedom to infant industrial enterprises, "to insulate the employer as much as possible from bearing the 'human overhead' which is an inevitable part of the cost—to someone—of the doing of industrialized business."*

355 U.S. at 431, 78 S.Ct. 394 (emphasis supplied). See also *Tiller v. Atlantic Coast Line R. Co., supra,* 318 U.S. at 59, 63 S.Ct. 444.

With the late 19th Century growth in economic power of the railroad industry, however, the courts consciously readjusted the allocation of the risks between employer and employee.

> The courts, in developing *the FELA with a view to adjusting equitably between the worker and his corporate employer the risks inherent in the railroad industry, have*

*plainly rejected many of the refined distinctions necessary in common-law tort doctrine* for the purpose of allocating risks between persons who are more nearly on an equal footing as to financial capacity and ability to avoid the hazards involved.

355 U.S. at 438, 78 S.Ct. 394 (emphasis supplied).

## F. The FELA's Liberal Interpretive Mindset

Because of its midway position between a common law action in negligence and a workers' compensation claim, a FELA case calls for an interpretative approach that is significantly different from that which ordinarily prevails in a suit for common law negligence. As early as *Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 74 L.Ed. 1082 (1930), the Supreme Court set out the interpretive guidelines:

> The Act is not to be narrowed by refined reasoning. *It is to be construed liberally* to fulfill the purposes for which it was enacted.

(Emphasis supplied).

*Urie v. Thompson, supra,* was a case in which the Supreme Court, without any clear textual predicate, held that the FELA covered occupational diseases as surely as it covered accidental physical injuries. Its *ratio decidendi* was the broad purpose energizing the FELA.

> Considerations arising from *the breadth of the statutory language, the Act's humanitarian purposes, its accepted standard of liberal construction* in order to accomplish those objects, *the absence of* anything in the legislative history indicating *a congressional intent to require a restricted interpretation* or expressly to exclude such occupational disease, and the trend of existing authorities dealing with the question, *combine to support this conclusion.*

337 U.S. at 180–81, 69 S.Ct. 1018 (emphasis supplied). The Court went on to spell out the attitude with which the FELA must be viewed:

> *The language is as broad as could be framed:* "any person suffering injury while he is employed"; and "such injury or

death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier"; "by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances," etc. On its face, every injury suffered by any employee while employed by reason of the carrier's negligence was made compensable. *The wording was not restrictive* as to the employees covered; the cause of injury, except that it must constitute negligence attributable to the carrier; or the particular kind of injury resulting.

*To read into this all-inclusive wording a restriction* as to the kinds of employees covered, the degree of negligence required, or the particular sorts of harms inflicted, *would be contradictory to the wording, the remedial and humanitarian purpose, and the constant and established course of liberal construction of the Act followed by this Court.*

337 U.S. at 181–82, 69 S.Ct. 1018 (emphasis supplied).

Referring to this series of liberal interpretations, *Urie v. Thompson* summarized:

We think they were made in *the spirit the statute contemplated* for its administration and application. *That spirit is one not in conformity with importing nice distinctions in applying the act's broad and general terms or cutting down their full scope by inference or implication.*

337 U.S. at 186, 69 S.Ct. 1018 (emphasis supplied).

In *Kernan v. American Dredging Co., supra,* Justice Brennan reaffirmed the liberal interpretation that must be brought to bear on any FELA case.

Congress saw fit to enact a statute of the most general terms. . . . *[I]t is clear that the general congressional intent was to provide liberal recovery for injured workers;* and *it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers.*

355 U.S. at 432, 78 S.Ct. 394 (emphasis supplied).

Justice Brennan further explained the mechanism by which the FELA should continue to evolve in order to provide

"compensation for injuries to employees consistent with the changing realities of employment in the railroad industry."

Congress, in 1908, did not crystallize the application of the Act by enacting specific rules to guide the courts. Rather, *by using generalized language, it created only a framework within which the courts were left to evolve,* much in the manner of the common law, *a system of principles providing compensation for injuries to employees consistent with the changing realities of employment in the railroad industry.*

355 U.S. at 437, 78 S.Ct. 394 (emphasis supplied).

The drumbeat of liberal interpretation continued uninterrupted in *Atchison, Topeka and Santa Fe v. Buell, supra.*

*We have* recognized generally that the FELA is a broad remedial statute, and have *adopted a "standard of liberal construction in order to accomplish [Congress'] objects."*

480 U.S. at 562, 107 S.Ct. 1410 (emphasis supplied). Most recently, *Consolidated Rail Corporation v. Gottshall, supra,* reconfirmed the spirit in which a FELA case must be approached.

Relying upon "the breadth of the statutory language, [and] the Act's humanitarian purposes," *this Court has accorded the FELA a notably "liberal construction in order to accomplish [Congress'] objects."*

512 U.S. at 560–61, 114 S.Ct. 2396 (Dissenting opinion of Ginsburg, J.) (emphasis supplied).

In the wake of this juggernaut of language, consistently iterated and reiterated over the course of seven and one-half decades, it is not hard to figure out who wins the ties and who gets the benefit of the close calls.

## The Special Context of a FELA Case

In any event, the FELA has created a cause of action that, if not odd, is, at the very least, far from the run of the mill. It is unquestionably bipolar. Hopefully, this pre-analysis reconnaissance will provide some sense of the unusual terrain on

which we will be operating, as we turn now to the FELA case before us.

## The Present Case

The appellee, Donald Miller, filed suit against the appellant, CSX Transportation, Inc., in the Circuit Court for Baltimore City, alleging a violation of the Federal Employers' Liability Act ("FELA"). CSX is a railroad. Miller was for 24 years an employee of that railroad. He sought recovery for bilateral osteoarthritis of the knees caused by cumulative trauma occurring over the period of his employment with CSX. After a six-day trial, presided over by Judge Alfred Nance, the jury returned a verdict in favor of Miller for $1,500,000.

On appeal, CSX raises four major issues, with a variety of sub-issues. The major questions are:

1. Whether Judge Nance erroneously failed to grant CSX's motion for summary judgment on the limitations issue, to wit, whether Miller knew or should have known of his injury by August 13, 1998?

2. Whether Miller's FELA claim was pre-empted by federal regulations contained in the Federal Railroad Safety Act?

3. Whether Miller presented legally sufficient evidence, quantitatively and qualitatively, to prove that CSX was negligent and that that negligence caused Miller's injury?

4. As a gratuitous contention that we have added, Whether Judge Nance erroneously permitted three expert witnesses to offer expert opinions?, and

5. Whether Judge Nance erroneously admitted evidence of yard conditions, complaints, and injuries at other CSX locations outside of Baltimore?

## "Workin' on de Railroad"

Miller, who turned 54 years of age during the course of the trial, had been working on the railroad, not only "all de lib long day," but since shortly after he was released from military service at twenty years of age. He went to work for CSX (or its predecessor) in 1969, first as a signalman and then

as a member of a track gang. All parties agree, however, that it is only his employment after 1978 that has pertinence to this case.

It was in 1978 that Miller went into what he described as "train service." From 1978 through 1984, Miller worked primarily as a road conductor. That job required him "to move trains from point A to point B on the mainline." If a train were going from Baltimore to Philadelphia, for instance, it would stop at various places to pick up and to drop off railcars at various businesses and industries along the route. Miller was heavily involved in the switching of railcars, as various railcars were either dropped off from the train or added to the train. As a road conductor, Miller had "to get on and off the train" on a number of occasions "for switches, picking up freight, if we had any emergencies." He estimated that he walked "one or two miles a day" on large ballast or "road ballast," defined as stones or rocks of between one inch and two and one-half inches in diameter.

In 1984, Miller's job changed from that of a road conductor to that of a yard conductor. As a yard conductor, Miller worked from approximately 1984 through 2002 in the five CSX rail yards in the Baltimore area. The primary job was that of switching railcars from one track to another in order to put together or configure a proper train that would then move out on the main line. The work as a yard conductor entailed four types of physical activity: 1) walking between three and five miles a day on ballast; 2) mounting and dismounting both moving and stationary cars between 50 and 100 times a day; 3) squatting to throw 80–pound ball-handled switches 30 to 40 times a day; and 4) squatting to connect air hoses under the railcars between 40 and 50 times a day. Of particular significance was the fact that in the early 1980's, the surface of the track walkways in or near the yards and the entire yards themselves was switched from small walking ballast, that is, cinders between 3/8″ and 1″ in diameter, to large ballast or road ballast.

## Miller's Medical History

Miller's work, first as a road conductor and then as a yard conductor, ultimately took its physical toll. He developed osteoarthritis in both knees and, after a partial left knee replacement surgery, was unable to work at all after November of 2002. The overt medical history in this case began on January 20, 1997, when Miller awoke with a swollen left knee. He went to the emergency room of the Johns Hopkins Bayview Medical Center, where the knee was x-rayed. Miller testified as to the diagnosis, treatment, and aftermath.

Q. What medical care were you given?

A. They x-rayed it. They come back out and told me that I had swelling in there, and *they told me to go home and put ice packs on it, and if the swelling got any worse or burning in it, come back to the hospital.*

Q. *Did you have any subsequent problem?*

A. *No, sir.*

Q. *What happened to the swelling?*

A. *It went away.*

Q. *What happened to the pain?*

A. *It went away.*

Q. Did you miss any work?

A. No, sir.

(Emphasis supplied).

He also testified to earlier pains in his knees, which he simply attributed to the aging process.

Q. Had you ever had a problem like that before?

A. No, sir.

Q. *Had you had any pain prior to that in your knees?*

A. *I thought it was growing pains, I mean, getting old pains, growing pains, whatever you call it.*

Q. Old Father Time?

A. Yes, sir.

(Emphasis supplied).

Following that January 20, 1997, visit to Bayview, the medical history was silent for three and one-half years. Neither before that time nor during that time had Miller missed a day's work because of his knees. It was in August of 2000, when Miller was working at CSX's Curtis Bay yard, that his knee "gave out" as he was getting ready to throw a switch and he started to fall but caught himself. Miller went to his family doctor, Dr. Deepak Seth, who gave him a shot of cortisone. Miller returned to work.

Because his knee, notwithstanding the cortisone, continued to bother him, Miller returned to Dr. Seth, who referred him to an orthopedic specialist, Dr. Douglas Shepard. Dr. Shepard diagnosed Miller as having osteoarthritis and, on August 16, 2000, performed an arthroscopy on Miller's left knee. After a brief recovery time, Miller returned to work and continued to work for the next two years, mainly on the road instead of in the yard. In the latter part of 2002, Miller returned to Dr. Shepard, who recommended a partial knee replacement and referred Miller to Dr. Thomas Whitten. Dr. Whitten performed the partial knee replacement on December 6, 2002. Miller did not return to work after that surgery. Dr. Robert S. Widmeyer, an orthopedic specialist, later examined Miller and believed that Miller would unquestionably require a full knee replacement on his left knee and was at risk for requiring, at some point, a knee replacement of the right knee.

## The FELA Statute of Limitations

CSX contends that Miller's suit was time barred under the applicable statute of limitations. For a FELA suit, 45 U.S.C., § 56 provides:

No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued.

This claim was filed on August 13, 2001. For accrual purposes, the critical date, looking back three years, was August 13, 1998.

## A. Accrual as a Matter of Law and Accrual as a Matter of Fact

There were only three legal possibilities: 1) that the evidence that Miller had the requisite awareness as of 1998 was so clear, decisive, and unequivocal that Judge Nance should have decided the limitations issue in CSX's favor, as a matter of law; 2) that the evidence was so clear, decisive, and unequivocal that Miller lacked the requisite medical awareness as of 1998 that Judge Nance should have decided the limitations issue in Miller's favor, as a matter of law; or 3) that the issue, as is always statistically more likely, fell within that 80% bulge of the bell-shaped curve where there was some plausible evidence pointing in each direction. If that third possibility was the case, the resolution of the limitations issue was quintessentially a matter of fact and not a matter of law. We agree with Judge Nance that this question was, indeed, one of fact for the jury to resolve.

## B. An Interpretive Guide

In evaluating limitations in a FELA context, *Crisman v. Odeco, Inc.,* 932 F.2d 413, 416 n. 2 (5th Cir.1991), lends guidance.

> As for *the standard* used *in evaluating FELA actions ...* the standard *is more lenient* than that which applies in the ordinary action.

(Emphasis supplied).

## C. Dramatic Accidents Versus Progressive Injuries

With a progressive occupational injury or slowly worsening occupational disease or condition, such as, e.g., deafness, carpal tunnel syndrome, silicosis, or, as in this case, osteoarthritis, the accrual of a cause of action cannot be precisely pinpointed, as it easily can with a more dramatic physical accident. In *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018,

93 L.Ed. 1282 (1949), the Supreme Court addressed just such a gradually progressive and almost indiscernible decline. In a FELA case where an employee's silicosis had been developing for arguably as long as 31 years, the defendant railroad asserted FELA's three-year statute of limitations. The Supreme Court rejected the railroad's

> mechanical analysis of the "accrual" of petitioner's injury— whether breath by breath, or at one unrecorded moment in the progress of the disease.

337 U.S. at 169, 69 S.Ct. 1018. It quoted with approval, *id.*, *Associated Indemnity Corp. v. Industrial Accident Commission*, 124 Cal.App. 378, 381, 12 P.2d 1075, 1076 (1932), as that case distinguished, for accrual purposes, between a period of time and a point of time.

> "It follows that no specific date of contact with the substance can be charged with being the date of injury, inasmuch as *the injurious consequences of the exposure are the product of a period of time rather than a point of time;* consequently, *the afflicted employee can be held to be 'injured' only when the accumulated effects of the deleterious substance manifest themselves."*

337 U.S. at 170, 69 S.Ct. 1018 (emphasis supplied).

### D. *United States v. Kubrick* and the Discovery Rule

In such cases of progressive trauma, the accrual date is determined by applying what has come to be called "the discovery rule." Refined by *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), the discovery rule fixes accrual at the time the plaintiff first becomes aware of both 1) the existence of an injury and 2) the cause of the injury. *United States v. Kubrick, supra*, is the accepted authority on the accrual of a cause of action pursuant to the discovery rule. While *Kubrick* agrees that an action does not accrue until a plaintiff has the necessary awareness of the medical situation to know 1) that he has suffered an injury and 2) the cause of the injury, it further holds that accrual need not abide an awareness of the legal implications of the injury. A plaintiff, albeit not obliged to discover his medical condition,

is charged, once that medical condition is known to him, to explore its legal implications within the limitations deadline. The distinction is between ignorance of one's medical condition and ignorance of its legal implications. The law indulges the first, but not the second.

The best explication of *Kubrick* is found in *Dubose v. Kansas City Southern Railway Co.*, 729 F.2d 1026, 1029 (5th Cir.1984).

> In the five years prior to *Kubrick, a few courts expanded the discovery rule to require that a plaintiff "know the legal implications of the facts, as well as the facts themselves,* before the limitations period . . . begin[s] to run."
>
> *In Kubrick, the Court disapproved of and cut back on the expanded discovery rule.* . . . The Court reiterated the *Urie* rationale behind the discovery rule and approved its application to cases where the fact of injury may be unknown or unknowable and where the facts of "causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain." . . . *While upholding the discovery rule as it had generally developed, the Court refused to extend the rule* so as to defeat the limitations statute's "obvious purpose, which is to encourage the prompt presentation of claims."

(Emphasis supplied). *Dubose* reaffirmed that an action has not yet accrued when "a plaintiff is not aware of and has no reasonable opportunity to discover the critical facts of the injury and its cause." 729 F.2d at 1030.

With respect to the discovery rule, we find the decision of the Missouri Court of Appeals in *Rogers v. Illinois Central Railroad Co.*, 833 S.W.2d 426, 427–28 (Mo.App.1992), not only highly persuasive but lucidly explanatory.

> *In FELA occupational disease cases, a "discovery" rule has evolved.* When the specific date of injury cannot be determined because an injury results from continual exposure to a harmful condition over a period of time, the cause of action does not accrue until the injury manifests itself.

The rule was refined by the United States Supreme Court in *United States v. Kubrick. Kubrick* held that *a plaintiff's claim accrues at the time that plaintiff first becomes armed with the critical facts of both the existence and the cause of his injury, regardless of whether plaintiff is then aware that these facts constitute legal negligence.* We have held that an occupational disease claim is deemed to accrue under FELA *when the claimant becomes aware or has reason to be aware that he has been injured and is aware or has reason to be aware of the cause of his injury.* (Emphasis supplied).

That opinion also drew an insightful distinction between the standards of "could have known" and "should have known." The issue of when plaintiff *knew or should have known* of his injury and its cause is a question of fact for the jury.

In the case of actual knowledge, the cause of action accrues when the character of the condition and its cause first "c[o]me together" for the plaintiff. *The "should have known" test is not narrowly confining. The test is not a "could have known" test.* Rather, *it requires a very substantial common-sense likelihood that a reasonably careful person would discover the existence of the injury and its cause.*

833 S.W.2d at 428 (emphasis supplied).

### E. Knowledge of Injury and Knowledge of Cause

In *Kubrick,* the Supreme Court made it clear that there are three areas of knowledge that are of critical significance on the limitations issue. They are 1) knowledge of the existence of an injury; 2) knowledge of the cause of the injury; and 3) knowledge of the legal significance of the injury. The Supreme Court posed the question before it.

The issue in this case is *whether the claim "accrues"* within the meaning of the Act *when the plaintiff knows both the existence and the cause of his injury or* at a later time *when he also knows that the acts* inflicting the injury *may constitute medical malpractice.*

444 U.S. at 113, 100 S.Ct. 352 (emphasis supplied). The Court made it clear that the accrual of a cause of action does not depend on the third area of knowledge (legal significance) but does depend on the congruence of the first two (existence of injury and cause of injury).

The injury to the patient in *Kubrick* was a loss of hearing. The cause of the injury was erroneous treatment with an antibiotic drug known as neomycin. The legal significance was that the doctor who administered the neomycin might have been liable for medical malpractice. The Supreme Court held that Kubrick's cause of action accrued in January of 1969 when he had become aware of "both his injury and its cause." 444 U.S. at 120, 100 S.Ct. 352. As of that time, he had both 1) been diagnosed with bilateral nerve deafness and 2) been informed that "it was highly possible that the hearing loss was the result of the neomycin treatment administered at the hospital." 444 U.S. at 114, 100 S.Ct. 352. The Court regularly referred to these threshold awarenesses in the plural.

It is undisputed in this case that in January 1969 *Kubrick was aware of his injury and its probable cause.*

444 U.S. at 118, 100 S.Ct. 352 (emphasis supplied). The Supreme Court reiterated that "since he was aware of these essential facts in January 1969," the cause of action accrued at that time and did not need to await his learning, two years later, that "the neomycin irrigation treatment had been improper." 444 U.S. at 121, 100 S.Ct. 352.

The medical awareness and the legal awareness were two distinct things subject to two distinct treatments.

*We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment.*

444 U.S. at 122, 100 S.Ct. 352 (emphasis supplied).

For present purposes, the analogue to Kubrick's awareness of deafness would have been Miller's awareness of osteoarthritis. The analog to Kubrick's awareness that the deafness had been caused by neomycin would have been Miller's awareness

that the osteoarthritis had been caused by walking on large ballast. There was, at the very least, evidence indicating that Miller was not yet aware of both of those facts as of August 13, 1998, and arguably was not aware of either of them.

On the limitations issue in this case, the critical question is whether Miller, as of August 13, 1998, knew or should have known both 1) that he was suffering from osteoarthritis in one or both of his knees and 2) that the osteoarthritis was attributable to his years of pounding the ballast trail. The accrual of the action, on the other hand, did not depend on his awareness that CSX might be liable in negligence for having laid down that ballast trail.

### F. Two Degrees of Knowledge: "Knew" Versus "Should Have Known"

We can narrow the issue before us to some extent. From the litany of "knew or should have known," we can quickly eliminate the first prong. As to whether there was some evidence to support the conclusion that Miller did not actually know he had osteoarthritis as of January of 1997, the answer is easy. Miller testified that he did not know. That, *ipso facto*, was enough to take the question of actual knowledge to the jury. The rest of the evidence on that sub-issue was surplusage.

The real sub-issue is whether there was any evidence to permit a reasonable inference that Miller was **NOT** in possession of such knowledge as to compel the conclusion that he should have known that 1) he had osteoarthritis of the knees 2) caused by his on-the-job walking on large ballast.

### G. The Critical Hospital Visit of 1997

Fixing on Miller's state of awareness prior to August 13, 1998, our attention necessarily turns to the circumstances surrounding his visit to the Bayview Medical Center on January 20, 1997. The significance of Miller's 1997 visit to Bayview, of course, is that it was before the critical accrual frontier boundary of August 13, 1998. If the action had

accrued as of that 1997 visit to Bayview, this FELA suit would have been time-barred. If, on the other hand, the action did not accrue as of the visit to Bayview, this suit was timely filed within the three-year limitations period. Nothing of any medical significance happened between the two milestones of January of 1997 and August of 2000. If the accrual of the cause of action did not occur in 1997, then it did not occur until 2000 and there is no limitations problem. Our attention, therefore, remains glued on January of 1997.

Miller testified that he went to the emergency room at Bayview because he awoke one morning and his left knee was swollen. A doctor x-rayed the knee and then came "back out and told me that I had swelling in there, and they told me to go home and put ice packs on it, and if the swelling got any worse or burning in it, come back to the hospital." Miller, as directed, went home and put on an ice pack. The swelling went away; the pain went away; and Miller went back to work. Miller further testified that he had never had a problem like that before. Whatever aches or pains he had ever felt in his knees, he attributed to the inexorable ravages of aging.

The medical record of Miller's visit to Bayview completely corroborated Miller's testimony. The "History and Physical Findings" recited:

47 years old. Came to the emergency room complaining of a painful left knee. Recalls no trauma. Awoke today with pain and swelling. *No history of arthritis.*

(Emphasis supplied). Bayview's diagnosis was that Miller had a "knee strain and knee effusion." The treatment prescribed was to use ice and to put an elastic bandage on his knee. Bayview gave him a prescription for anti-inflammatory medicine. There was in the file an x-ray, with a note on the left-hand side reading "Left knee, no fracture and few osteophytes."

One of the expert witnesses on the issue of causation, Dr. Robert S. Widmeyer, also testified that when he later took a medical history, Miller described his visit to Bayview in 1997.

Q. Could you tell us what the medical history was in relation to the 1997 emergency room visit, if you could, sir?

A. *He had not had any previous problems with his knees before* and he just woke up and couldn't move his knee because it hurt so bad and it swelled up, so he went to the emergency room. And *he thought he was getting older,* and from what I can gather from the emergency room, *they just told him he had a sprain, and he ought to put the ice and Ace wrap on it, and he would be okay. Then he went back to work.*

(Emphasis supplied). Immediately after his visit to Bayview, Miller did go back to work and he did not miss a day's work for the next three and one-half years.

## H. The Unseen X-ray

To be sure, two days after Miller left Bayview, an x-ray report was prepared which recited as its impression: "osteoar-thritis." Miller, however, never saw that report and was never informed about it. Sternly pressed on cross-examination about the x-ray impression, Miller maintained his position that he thought his knee problem had satisfactorily resolved itself.

Q. What did you understand from your visit to Bayview Medical Center was wrong with you?

A. A sprain and fluid on my knee.

Q. Was an x-ray taken?

A. To my knowledge, it was, but I never seen it.

Q. *Why have you never seen the x-ray,* Mr. Miller?

A. *Because when they released me, they told me to put ice on it, go home and take aspirin; if I had any further problems, go to my family doctor.*

Q. But it's true, Mr. Miller, the *you have never inquired as to what that x-ray showed; is that correct?*

A. *That's correct. I never had any more problems.*

Q. *Has anybody made you aware of the contents of the x-ray?*

A. *No, they haven't.*

(Emphasis supplied).

■ CSX purports to be aghast at Miller's failure to have called Bayview back and to have insisted on learning what impression, if any, was made of his x-ray. CSX strongly suggests, without quite saying so, that under the "should have known" standard, Miller should be charged with the knowledge of that impression. As it then proceeds to pose the accrual issue, CSX, without so much as a "by your leave," treats Miller's state of self-awareness as, indeed, charged with such knowledge.

CSX seems to posit, in that regard, some sort of intellectual or professional imperative to chase down the answer to every pending inquiry. There might, to be sure, be some such imperative churning within the reasonable operating surgeon, always fearful of malpractice suits; in the reasonable tort lawyer, always looking for an edge at the trial table; or in the reasonable national security officer, always sensitive to the chance of a Congressional investigation. It is, at the very most, no more than a jury question, however, whether any such psychic imperative burns in the breast of the reasonable railroad worker. The reasonable railroad worker, to the extent that he thinks about it at all, might well be content to believe that a satisfactory x-ray result has been implicitly folded into the diagnosis, the prescription, and the presumptively final discharge that Bayview gave him.

We are not suggesting that, even had Miller been informed of the x-ray impression, an awareness of osteoarthritis would *ipso facto* trigger an awareness that the osteoarthritis had been caused not by old age, but by years of walking on large or mainline ballast.

## I. Not a Jury Question At Least, But a Jury Question At Most

Our review of the evidence satisfies us that there was, at most, a jury question as to whether Miller's awareness of the medical situation was such that the cause of action accrued in

January of 1997, to wit, before August 13, 1998. To the extent to which we might harbor any tinge of doubt about the existence of a genuine jury question, moreover, our tilt would be decidedly toward a ruling, as a matter of law, in favor of Miller and not toward a ruling, as a matter of law, in favor of CSX. Whether there might have been a ruling in favor of Miller, as a matter of law, however, is a moot point, for whatever arguably should have been done as a matter of law was done as a matter of fact. As one of five distinct issues submitted to it, the jury was asked: "Do you find by a preponderance of the evidence that the plaintiff, Donald E. Miller, knew or should have known of his degenerative knee condition on or before August 13, 1998?" The jury answered, "No."

CSX professes deep chagrin that Judge Nance did not give more significance to the fact that Miller, on his visit to Dr. Shepard in June of 2000, acknowledged having felt pain in his knees off and on since the early 1990's. The way in which the trial unfolded, however, suggests that Judge Nance did give significance to that earlier complaint. That evidentiary shred seems to us to have the only thing that qualified CSX even to take the limitations issue to the jury. Without it, Judge Nance might well have granted a judgment on limitations in favor of Miller, as a matter of law. That reprieve from a forfeit, moreover, was no mean victory for CSX. It was given a fighting chance on the limitations issue in front of the jury. To lose on the playing field of fact-finding is always preferable to suffering a forfeit before the game is even allowed to begin.

CSX would make far more of that shred of evidence than it deserves. It would like that earlier and very generalized complaint about knee pain to be deemed absolutely dispositive of the accrual issue in its favor. It fails to acknowledge the chasm of difference between the quantum of evidence that permits a conclusion and the uncontradicted mass of evidence that compels a conclusion.

The critical difference between generating a permitted inference of possible awareness, as a matter of fact, and the

overwhelming case that will compel such a conclusion, as a matter of law, is well illustrated by *Gay v. Norfolk and Western Railway Co.*, 253 Va. 212, 483 S.E.2d 216 (1997). The defendant railroad in that case argued that the cause of action in that case accrued at the time the plaintiff both knew that he had an injury and also "suspected" that the cause of his injury was the inhaling of toxic fumes while on the job. The Supreme Court of Virginia held that even a suspicion as to the cause of the injury might be enough to permit such a conclusion, as a matter of fact, but was not enough to compel such a conclusion, as a matter of law. The Virginia Supreme Court held:

> N & W argues that the trial court correctly held that Gay's cause of action accrued in 1989 when he was diagnosed with leukemia because Gay testified that, at that point, he *suspected* his leukemia was caused by inhalation of diesel fumes. . . .
>
> . . . .
>
> *An employee's mere suspicion of an injury or its probable cause, standing alone, is not the operative standard for determining when a cause of action accrues under FELA.*

483 S.E.2d at 219 (emphasis supplied).

The opinion concluded that the question of whether **that which is suspected** is tantamount to **that which should have been known** is quintessentially a jury issue.

> [I]f reasonable persons could disagree about when Gay "knew or should have known" that his injury was work-related, the issue should be submitted to the jury. *It is improper, however, to resolve the issue solely on the basis that an employee suspected that his illness was work-related.*

*Id.* (emphasis supplied). On slender evidence in this case, CSX got the benefit of having the limitations issue treated as a jury question. It may have gotten more than it deserved. It certainly was not entitled to anything more.

### Preclusion by the Federal Railroad Safety Act (FRSA)

Immediately prior to the commencement of the trial, CSX moved for summary judgment in its favor on the ground that one of the Track Safety Standards, 49 C.F.R. § 213.103, promulgated by the Federal Railroad Administration (FRA), an agency created by the Federal Railroad Safety Act (FRSA),[2] touches the subject of ballast and has, therefore, "preempted" any common law tort principle, any state law, any industry regulation, or any internal railroad regulation dealing with ballast. CSX's position is that if its use of large ballast does not violate the Track Safety Standards of the FRA, no FELA suit predicated on its use of large ballast can even be litigated against it. Judge Nance denied CSX's motion for summary judgment on that ground.

### A. For a FELA Claim, the Risk is Preclusion, Not Preemption

CSX's motion for summary judgment was not based on preemption, although it was so styled, and it is a misuse of language to discuss the contention in terms of preemption. The preemption doctrine grows out of the Supremacy Clause, Article VI of the United States Constitution, which provides:

> This Constitution, and the laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.

Preemption has to do only with the federal-state relationship. If the national Congress, with authority to do so, as when regulating interstate commerce, passes a statute effectively covering a subject, that national law, pursuant to the Supremacy Clause, preempts any state law or state statute. A FELA suit, however, is not an action pursuant to state law but one pursuant to the Federal Employers' Liability Act of

---

2. One of the occupational hazards of dealing with federal regulations is the risk of drowning in alphabet soup.

1908. It is, by definition, federal and, therefore, not subject to preemption.

*Elston v. Union Pacific Railroad Co.*, 74 P.3d 478, 486 (Colo.App.2003), points out the difference between a federal-state conflict and a federal-federal conflict.

> *The vast majority of cases* addressing locomotive-related accidents *involve a state law claim and a federal claim* for violation of the FRSA. *In that posture, it is necessary to employ a preemption analysis.* Here, however, we are *presented with the interaction of two federal statutes,* and thus, *preemption* in its constitutional sense *does not apply.*

(Emphasis supplied).

The FRSA has its own built-in preemption clause, 49 U.S.C. § 20106, providing that any FRSA-authorized regulations which cover the field will preempt any state law or statute in that field. *Grimes v. Norfolk Southern Railway Co.*, 116 F.Supp.2d 995, 1000 (N.D.Ind.2000), explains how that preemption clause applies to state laws.

> To facilitate the goal of national uniformity *the FRSA has a preemption clause specifically relating to state law* which provides that states may regulate railroad safety "until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement."

(Emphasis supplied).

This is not to say that one federal statute may not have an overriding impact on another federal statute. The impact, however, is by virtue of a process other than federal-state preemption. If a railroad, for instance, has done everything that it is enjoined to do by the Locomotive Inspection Act (LIA), formerly known as the Federal Boiler Act, or by the Federal Railroad Safety Act, passed in 1970, the railroad may not be held liable in a FELA suit for conduct which the more specific federal act has expressly and specifically deemed to be acceptable. The legal event triggered by a superseding statutory provision, however, is issue preclusion, not preemption.

*CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), was a case in which a provision of the FRSA was held to have covered the field of train speeds and, therefore, to have preempted a Georgia state statute. *Norfolk Southern Railway Co. v. Shanklin,* 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000), was a case in which a provision of the FRSA was held to have covered the field of warning devices at crossings and, therefore, to have preempted a Tennessee state tort claim. Both cases were classic applications of federal-state preemption law. *Easterwood* and *Shanklin* established two clear areas wherein FRSA regulations covered the field and, therefore, preempted state law. *Grimes v. Norfolk Southern, supra,* 116 F.Supp.2d at 1000, summarized:

> In cases brought under state law, the Supreme Court has found two areas, speed regulations and warning signs at grade crossings, where federal regulations pursuant to FRSA have "covered" the field such that *any attempts at state regulation inconsistent with the federal regulations are preempted.*

(Emphasis supplied).

The problem of loose language seems to have stemmed from several cases interpreting *Waymire v. Norfolk and Western Railway Co.,* 218 F.3d 773 (7th Cir.2000), a case in which a FELA claim was brought on the same grounds of 1) excessive speed and 2) an unsafe crossing that had led to the preemption holdings in *Easterwood* and *Shanklin.* Although the federally-based FELA charge could not, by definition, be preempted, it was, by analogy to those preemption cases, held to have been superseded or precluded. *Waymire* itself was careful, 218 F.3d at 775, to use the language of preclusion and not of preemption. Subsequent cases, however, began to speak broadly of *Waymire* as having "extended the *Easterwood* and *Shanklin* rulings" to FELA cases, implying that it extended the reach of preemption. As a consequence, several federal cases speak the language of "preemption" even when talking about federally-based FELA cases. *In re: Amtrak "Sunset Limited" Train Crash,* 188 F.Supp.2d 1341, 1348

(S.D.Ala.2000); *Major v. CSX Transportation,* 278 F.Supp.2d 597, 608–09 (D.Md.2003).

*Elston v. Union Pacific, supra,* 74 P.3d at 486–87, has more carefully explained that, although as a practical matter the result may be the same, a FELA case may be superseded, but it is not preempted.

> [T]hat court [*Waymire* ] determined *FELA is superseded by the FRSA to the same extent that the FRSA preempts state law,* and that liability may not be imposed under either when railroads have complied with FRSA requirements.

(Emphasis supplied).

In framing the argument before it, *Grimes v. Norfolk Southern, supra,* 116 F.Supp.2d at 1000–01, was very careful to pose the issue in terms of preclusion, rather than preemption.

> Under NSRC's interpretation of *Waymire, compliance with these regulations precludes the Plaintiff's negligence suit* and essentially makes it immune to FELA suits arising out of accidents that occur when employees in the course of their employment must find a place to walk down the railroad right-of-way.

(Emphasis supplied).

*Rice v. Cincinnati, New Orleans & Pacific Railway Co.,* 955 F.Supp. 739, 740 (E.D.Ky.1997), was meticulously careful about its doctrinal vocabulary.

> *Because this case is based on the FELA, the court is not faced with a typical preemption issue.* In considering this motion, however, the court must reconcile the two federal statutes. *To the extent that they are inconsistent, the FRSA will supersede the FELA,* based on the policy embodied in the FRSA to ensure uniformity in law pertaining to railway safety.

(Emphasis supplied).

To be sure, the practical result may be the same. The difference in the use of terms may only be a difference between practicality and academic purity, but those who casu-

ally abandon academic purity can never know where the next walk around the block may unexpectedly lead. We shall speak in this case about preclusion, not preemption.

## B. The Analogy to Preemption Law Is Nonetheless Apt

In terms of the actual preclusive impact that a precise provision of a federal statute, such as one under the FRSA, might have on a FELA claim, the analogy to preemption law is nonetheless an apt one. The *Waymire* case, 218 F.3d at 775, has explained:

> The vast majority of courts *examining lawsuits* arising out of automobile/train collisions do so *under state law.* Thus, *the courts employ a preemption analysis. We do not do so here,* as we are instead faced with the interaction of two federal statutes. *But, we find the opinion of the Supreme Court on the subject of the preemption of unsafe train speed claims to be instructive.*

(Emphasis supplied).

*Rice v. Cincinnati, New Orleans & Pacific, supra,* 955 F.Supp. at 741, has similarly pointed out:

> *[T]his is not a state law case;* the FELA is the sole remedy for this plaintiff. *However, the same rationale that supports preemption* of an unsafe speed argument in a state law case *also indicates that speed regulations* adopted pursuant to the FRSA *should supersede an unsafe speed argument in this FELA case.*

(Emphasis supplied).

*Elston v. Union Pacific, supra,* 74 P.3d at 486, agrees.

> *[T]he cases addressing the question whether the FRSA preempts state law* railroad injury claims *are instructive in determining whether plaintiff's FELA claim for negligence is precluded by the FRSA.*

(Emphasis supplied).

## C. The Alleged Basis For Preclusion

The FRSA has authorized the Federal Railroad Administration to promulgate Track Safety Standards. The only such standard remotely touching on the present case is 49 C.F.R.

§ 213. Subsection 213.101 sets out the scope of the regulation:

> *This subpart prescribes minimum requirements for ballast,* crossties, track assembly fittings, and the physical condition of rails.

(Emphasis supplied). Subsection 213.103, "Ballast; general," then provides:

> Unless it is otherwise structurally supported, *all track shall be supported by material* which will—
>
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
>
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
>
> (c) Provide adequate drainage for the track; and
>
> (d) Maintain proper track crosslevel, surface and alignment.

(Emphasis supplied).

There is no other FRSA or FRA regulation that even mentions the word ballast. At one point in its brief to this Court, CSX succinctly sets out its preclusion argument.

> *There are no other regulations* in 49 U.S.C. §§ 20101 *et seq.,* or 49 C.F.R. §§ 213 *et seq. which deal with ballast, and none prescribe a particular size ballast to be used in the walking areas of the yard to enhance worker safety.* The federal government had an opportunity to enact additional regulations as to size and location of ballast within the yard, but declined to do so. The clear implication from the absence of more specific regulations is that none have been deemed necessary by the federal government to ensure the safety of railroad employees working around ballast. *Thus, as long as a railroad's ballast complies with 49 C.F.R. § 213.103, it meets federal safety standards.*

(Emphasis supplied).

## D. The FRSA Does Not Preclude This FELA Suit

 We agree with Judge Nance that 49 C.F.R. § 213 did not preclude this FELA suit and that CSX's motion for

summary judgment based on preclusion ("preemption") was properly denied.

Even a surface glance at the FRSA regulation relied on by CSX persuades us that it does not touch, let alone pervasively cover, the railroad yard conditions that allegedly fell short of the safe and healthy workplace environment that CSX was obligated to provide for its employees. The regulation is concerned with the track and its immediately adjoining area and not with railroad yards. The obvious concern, moreover, is with the safety of the train, the prevention of derailments, and not the quality of the work place provided for employees. That important distinction was noted in *Southern Pacific Transp. Co. v. Public Utilities Comm'n,* 647 F.Supp. 1220, 1225 (N.D.Cal.1986), *aff'd,* 820 F.2d 1111 (9th Cir.1987):

> The ballast regulations ... are designed to insure that tracks have adequate support. ... *No FRA regulation addresses the concern that employees have a safe working environment near railroad tracks.*

(Emphasis supplied).

*Elston v. Union Pacific, supra,* 74 P.3d at 488, noted that, even with respect to walkways alongside the track:

> *[t]hese standards are directed at promoting a safe roadbed for trains,* but offer no indication whether a railroad has a duty to provide safe walkways for employees alongside its tracks.

(Emphasis supplied).

We have found two cases that deal with whether the FRSA, or any other federal regulation, precludes a FELA action based on a claim that a defendant railroad failed to provide a safe walking surface for employees. In *Grimes v. Norfolk Southern Railway Co., supra,* the plaintiff was injured when he fell into a hole as he, in walking along beside the tracks, was forced to walk well out beyond the track bed. He had been forced out to that distance because "on the area directly adjacent to the track" there were "large stones used in the ballast [that] rolled under his feet." 116 F.Supp.2d at 998.

One of the plaintiff's claims concerned that walking area immediately adjacent to the tracks:

> The Plaintiff's second claim is that the railroad was negligent in failing to provide a safe walkway for employees to use when they must walk alongside the train to inspect the cars.

116 F.Supp.2d at 1002.

Norfolk Southern there, as CSX here, moved for summary judgment on the ground that the FRSA regulation dealing with track beds and ballast covered the field and precluded any FELA claim. The defendant claimed, as does CSX here, that its compliance with 49 C.F.R. 213.103 was dispositive.

> NSRC alleges that it is in compliance with all these regulations, therefore it cannot be held liable for negligently inspecting the track or for failing to provide a safe walkway.

116 F.Supp.2d at 1002.

The federal District Court pointed out, as we have ourselves observed, that the FRSA regulations were concerned with "a safe roadbed for trains and not a safe walkway for railroad employees." The court flatly rejected the preclusion argument.

> Every circuit that has considered the issue of walkways has concluded that *the FRSA is silent on the question of walkways. The regulations are directed toward creating a safe roadbed for trains, not a safe walkway for railroad employees* who must inspect the trains. In view of the fact that this railroad requires its employees to perform numerous trackside inspections of its trains for various reasons, *this Court declines to find anything in the regulations cited by the Defendant that precludes this Plaintiff from asserting that the railroad was negligent for failing to provide a safe place to walk.*

There is also nothing in the language or legislative history of any enactment, including FRSA, that indicates the seri-

ous purpose of undermining the basic core of FELA and its essential purposes.

116 F.Supp.2d at 1002–03 (emphasis supplied).

*Elston v. Union Pacific, supra,* was also a case in which the plaintiff alleged that his knee injury resulted from the railroad's failure to provide a safe walking surface.

He then slipped and fell on the steeply pitched, snow-covered roadbed structural material, called "ballast," and thereby suffered injury to his right knee.

Plaintiff subsequently filed this lawsuit alleging that defendant was negligent under FELA for: (1) failing to provide reasonably safe walkways alongside its mainline tracks. . . .

74 P.3d at 481. The Union Pacific there, as CSX here, moved for summary judgment on the ground that 49 C.F.R. § 213.103 precluded the FELA claim. The trial judge agreed.

*[T]he trial court determined that the regulations* under other federal statutes *preempted plaintiff's FELA claim* that defendant failed to provide its employees with a reasonably safe walkway alongside its railroad line.

*Id.* (emphasis supplied).

The Colorado Court of Appeals reversed the trial court. It began its analysis by pointing out the railroad's obligation to provide a safe work place.

Under FELA, a railroad employer is required to provide its employees with a reasonably safe place to work.

74 P.3d at 482. On the preclusion issue, it summarized both the plaintiff's and the railroad's positions.

*[P]laintiff asserts that the FRSA's track safety standards do not cover the subject matter of safe walkways and, thus, do not preclude a FELA claim on this basis.* Defendant argues that . . . the trial court correctly determined that plaintiff's claim was precluded because defendant has complied with the FRSA's detailed regulations concerning ballast and track structure and the track safety standards cover the issue of walkways. . . . *We agree with plaintiff.*

74 P.3d at 485 (emphasis supplied). The Court of Appeals explained initially that, to "cover" a subject, a regulation must do more than "touch upon" it.

[T]he first issue is whether the FRSA covers the subject matter of railroad walkways. *To prevail* on a claim that the FRSA has preemptive effect, *the FRSA regulations must not merely touch upon or relate to the subject matter, but must substantially subsume it.*

74 P.3d at 486 (emphasis supplied).

The opinion pointed out that federal regulations have been deemed preclusive in the two areas of 1) warning signs at grade crossings and 2) train speed regulations, but that they have not addressed walkways.

Unlike the issues of excessive speed and inadequate warning devices that are expressly covered in the FRSA, *the issue of walkways is not explicitly addressed in the federal safety regulations.*

74 P.3d at 487 (emphasis supplied). If even walkways alongside the tracks are not covered, *a fortiori,* the walking surface throughout a railroad yard is not covered.

The conclusion of the Colorado Court of Appeals on preclusion is equally dispositive of CSX's claim before us that its compliance with the FRSA safety standard immunizes it from the FELA suit.

*Nothing in the language of the FRSA conflicts with or undermines the primary function of FELA.* Rather, the purpose of the FRSA, to promote safety in all areas of railroad operations and reduce railroad related accidents, is consistent with the goal of FELA, to promote employee safety and hold railroads liable for injuries caused by their negligence.

*We disagree with defendant that its alleged compliance with the FRSA's track safety standards precludes a finding of negligence under FELA.* Because walkways are not covered by the FRSA, *whether defendant complied with these regulations is immaterial in determining whether a*

*reasonable person* in defendant's situation *would have provided walkways alongside its tracks.*

74 P.3d at 488 (emphasis supplied).

At the summary judgment argument before Judge Nance, CSX candidly admitted that it was swimming upstream on this issue.

*I will not* mislead the Court to *say that the issue I'm about to discuss has not been decided adversely against the Railroad.* ... [Miller's attorneys] have quite rightly included *a couple of trial court decisions that say, no, the ballast claim is not preemptive. CSX respectfully disagrees with those decisions* and believes that our analysis of the issue is superior to that employed by those courts.

(Emphasis supplied).

## E. Negative Preclusion

Acknowledging that the FRSA has not promulgated any regulation with respect to the walking surface of railroad yards generally or, even out on the track bed, with respect to ballast size, CSX insists that the FRSA could have so regulated if it wished to. Before Judge Nance, CSX argued:

Now, they haven't. As of this date, they haven't, *but they could* and they've looking into it. *They've decided not to.*

(Emphasis supplied).

From that unused authority, CSX weaves the web of "negative preemption." CSX would infer from the failure of FRSA so to regulate, an affirmative decision that further regulation was both unnecessary and inappropriate. In its brief to this Court, CSX reiterates this notion of negative preemption or preclusion.

Furthermore, *it is clear that the federal government could, if it wanted to, regulate ballast size.*

In that regard, the Federal Railroad Administration (FRA) *has* promulgated specific Track Safety Standards which establish certain requirements for ballast. ... [T]here is nothing in the Track Safety Standards that mandates the use of a particular size ballast, or which

correlates a certain size ballast with employee safety. Nonetheless, Miller sought to hold CSX liable for not exceeding the safety requirements set by the. *CSX submits that it has no such duty, and that Miller's negligence claim is preempted by the federal regulations. As long as CSX complies with the ballast standards set forth in the FRA Track Safety Standards, no action for "unsafe" ballast will lie against CSX.*

(Emphasis supplied).

 *Elston v. Union Pacific, supra,* considered the idea of negative preemption in precisely this same context. After pointing out that "there is a presumption against preemption," it squarely rejected the notion that the failure of the FRSA to regulate ballast size or to prescribe surface conditions for railroad yards represented any sort of negative preemption or preclusion so as to bar FELA suits. ·

Alternatively, *defendant asserts that* even if the FRSA does not cover the subject matter of safe walkways, *its failure to include the matter in the track safety standards negatively preempts plaintiff's FELA claim.* Again, *we disagree.*

Negative preemption occurs "where failure of . . . federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute." *Negative preemption requires an "authoritative federal determination that [an] area is best left unregulated."*

Here, defendant has failed to point to a clear congressional directive that would lead us to interpret the FRSA track safety standards as precluding plaintiff's FELA claim. In fact, defendant has failed to adduce any evidence that the FRA, in promulgating the track safety standards, even considered the issue of safe walkways for railroad employees.

74 P.3d at 488 (emphasis supplied). See also *Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466,

478–82 (2002) (referring to negative preemption as implied preemption).

## F. A Decoy Subcontention

As a subcontention on the preclusion issue, CSX, out of thin air, conjures up a "straw man" and then knocks it down. To be sure, as Miller described his on-the-job physical activity over a period of years, he included the fact that he mounted and dismounted both moving and stationary cars between 50 and 100 times a day.

Seizing upon the reference to railway cars, CSX asserts that any part of Miller's osteoarthritis claim attributable to mounting and dismounting railroad cars has been precluded by both the Safety Appliance Act (SAA) and the Federal Motor Carrier Safety Administrative Act (FMCSAA). The argument is that regulations of those two agencies dealing with 1) sill steps and ladders on railway cars and 2) the distance between steps on those cars have been fully complied with and that a claim based on alleged violations of those regulations is barred. CSX argues:

> [A]ny FELA claim made by plaintiff linking climbing on and off rail cars as contributing to Miller's knee osteoarthritis and meniscal tear is equally unavailing. As with the ballast claim, this claim is preempted. Pursuant to 49 U.S.C. §§ 20301 et seq. of the Safety Appliance Act, standards have been set forth addressing sill steps and ladders. Additionally, 49 C.F.R. § 399.207(b)(2)(ii) of the Federal Motor Carrier Safety Administration establishes height requirements between the ground and the first sill step of a commercial motor vehicle. Once again, so long as CSX's railcars conform to those standards, no claim may succeed based upon injuries alleged to be caused by sill steps and ladders.

(Emphasis supplied).

The subcontention is so much smoke and mirrors. The FELA claim was not "based upon injuries alleged to be caused by sill steps and ladders." The critical element of the claim was never the nature of the sill Miller **stepped up onto as he**

mounted railway cars but the nature of the ground he **stepped down onto as he dismounted** those cars. Confining ourselves to the dismount, the critical factor is **not whence** he stepped **but whither** he stepped.

■ The evidence was that earlier in his employment, Miller had to mount and dismount trains that were moving at between two and five miles per hour, although at a later time the mounting and dismounting was confined to stationary railway cars. The evidence was that jumping from even a slowly moving train significantly increased the pressure or strain on ankles and knees. In either event, the existence of sills and the distance between steps had absolutely nothing to do with the impact of either stepping or jumping onto the ground. The negligence alleged was CSX's covering of that ground with large ballast, which would cause a foot or ankle to roll when landing on it. The sills and steps of the railway car had nothing to do with the nature of the surface onto which the employee would step or jump.

The two regulations now being raised are so absolutely immaterial to the FELA suit in issue as to be self-evidently non-preclusive.

### Legal Sufficiency of the Evidence: Proof of Causation

At the end of the entire case, CSX moved for judgment. It first renewed its earlier motions for judgment on the basis of 1) limitations and 2) "preemption." Then, in challenging the sufficiency of the evidence to establish its FELA liability, CSX clearly confined the challenge to the single issue of causation.

> We renew our motion that the plaintiff has failed to make out a prima facie case because *plaintiff has presented no competent evidence of a general causal association between plaintiff's work activities and plaintiff's resultant injury.*

(Emphasis supplied).

At the outset of arguing this contention in its appellate brief, CSX again clearly confined the legal sufficiency challenge to the issue of causation.

As a matter of law, *Miller failed to produce sufficient evidence* by way of expert testimony *that his osteoarthritis was a result of working on the walking surfaces in the CSX railyards.*

(Emphasis supplied).

This framing of the contention does narrow the necessary breadth of our review. CSX does not challenge the sufficiency of the evidence to show that it was negligent when, in the early 1980's, it replaced the soot, dirt and cinders that had covered the surface of its railroad yards in the Baltimore area with large mainline ballast. CSX similarly does not challenge the sufficiency of the evidence to show that it was able to foresee that the use of the large mainline ballast could be injurious to the feet, ankles, legs and/or knees of the employees who had to walk regularly on that large mainline ballast. The only fact in issue is the cause-and-effect relationship between walking on mainline ballast for an extended period of time and osteoarthritis of the knees.

Before turning to the three expert witnesses whom CSX particularly challenges, we shall summarize briefly the other and non-expert testimony bearing on causation. Miller himself testified to 1) the amount of walking, 2) the mounting and dismounting of railway cars, 3) the throwing of switches, and 4) the squatting to attach airhoses that he had been doing since 1984. He testified to the use of mainline ballast in the yards beginning in the early 1980's. He testified to the pains and aches in his knees beginning in the early 1990's and gradually getting worse until his knee replacement surgery in 2002.

William Reed, a 28-year veteran with CSX or its predecessors, testified that he worked in the Baltimore area railroad yards just as Miller did. He testified that he, like Miller, was required to mount and dismount railway cars that were moving at between four and ten miles per hour, until the early 1990's when mounting and dismounting was confined to stationary cars. He described the impact from dismounting a moving railway car.

Q. Could you describe to them *what it was like when your feet made contact with the large ballast* in getting off moving equipment?

A. *Your ankle would turn a little and your knee would twist a little, and you would get a jolt.*

(Emphasis supplied). He also described the difference between walking on small ballast and walking on large ballast.

Q. *Could you describe* to the jurors the difference between *walking on the large ballast* or the main line ballast and the walking ballast, Mr. Reed?

A. *Walking on the large ballast is stressful on your legs. You get tired.* On the small ballast, it's more like walking on the sidewalk. It's easier to walk on and less stressful.

(Emphasis supplied). Reed also recounted how he had complained to his supervisors about the large ballast "about 20, 30 times."

By agreement of the parties, it was stipulated that another employee of the CSX railroad yards in the Baltimore area, a Mr. Spencer, would testify to the same effect that Reed had testified to. The testimony of Miller and Reed and the stipulated testimony of Spencer all support the conclusion, direct or inferential, that walking or jumping on mainline ballast is a cause that produces an effect of more than ordinary strain on the lower legs, ankles and knees of the yard employees.

Ray Duffany, a graduate civil engineer and the former Chief of Maintenance for the Grand Trunk Railroad, was accepted as an expert witness on railway operations and safety. He testified about industry standards as promulgated by the American Railway Engineering Association (AREA). He testified as to the different ballast standards for tracks and for yards.

[I]f you were looking at it strictly from an engineering standpoint, you would want the larger ballast in all tracks. However, *because there is a lot of walking done in the yards, the AREA has formulated standards that are smaller* and *the purpose of having the smaller ballast is to*

*provide a reasonably safe workplace for employees who are working in yards* around moving heavy equipment.

(Emphasis supplied).

Duffany recounted how, during a two-year period with the Grand Trunk, an experimental use of large ballast in the yards was found to have resulted in "a significant increase in injuries to yard workers."

> I worked for the chief engineer and he had changed the ballast standard from the small ballast that was in existence prior to 1989 on the Grand Trunk to using large ballast. For approximately two years, at his direction, *we put the big ballast in [many] of the yards that we worked and we experienced a significant increase in injuries to yard workers.*

(Emphasis supplied).

Duffany also testified that CSX itself had an operating rule, effective since 1975, that only small ballast be used "for yard use or at other locations where there is considerable foot traffic." After visiting the CSX yards in the Baltimore area, Duffany concluded that the large ballast used in the yards was not in compliance "with national ballast standards" or with "CSX's own standards."

From both the national industry standard and CSX's own standard against using large or mainline ballast in the yards, it may be inferred that the collective experience has been that walking on large ballast is injurious to the lower extremities of the employees who do that walking. That is definitely pertinent to the issue of causation.

We now turn to the testimony of three key expert witnesses. Dr. Robert Widmeyer and Dr. Douglas Shepard were both accepted as experts in orthopedic medicine. Dr. Robert Andres was accepted as an expert in ergonomics. Dr. Andres also gave us the benefit of a definition of ergonomics.

> "Ergonomics" is the study of people at work. The purpose of ergonomics is to study the capability of humans, what the human body can do, and to design jobs and/or fix jobs so

that they don't demand more from the human body than it's capable of.

## A. Getting the Contention Straight

It is at this point in our analysis that we run into a major problem with the way in which CSX has framed its contention. The contention purports to challenge the legal sufficiency of the evidence to prove causation. The arguments that follow the framing of the contention, however, do not concern the legal sufficiency of the evidence actually in the case, measured as of the moment the decision must be made as to whether to submit the case to the jury. CSX's arguments, rather, concern the threshold admissibility of the opinions of the three experts. That might be the basis for a very different contention, even a very commendable contention, but a contention that has not been made.

It is clear that the proper way of attacking an allegedly flawed expert opinion is directly by an objection to its admission and not indirectly by a vague and undifferentiated motion that the evidence is not legally sufficient to take the case to the jury, a motion coming perhaps days after the opinion was ruled admissible. *Sippio v. State*, 350 Md. 633, 648–49, 714 A.2d 864 (1998); *Simmons v. State*, 313 Md. 33, 41–46, 542 A.2d 1258 (1988); *State v. Allewalt*, 308 Md. 89, 98–102, 517 A.2d 741 (1986); *Nizer v. Phelps*, 252 Md. 185, 192, 249 A.2d 112 (1969); *Kanaras v. State*, 54 Md.App. 568, 587–88, 460 A.2d 61 (1983); *Waine v. State*, 37 Md.App. 222, 246–47, 377 A.2d 509 (1977).

What CSX seems to be attempting may have been foreshadowed by the way it phrased its motion for judgment at the close of the entire case. It claimed that there was "no *competent* evidence" of causation. That adjective "competent," if allowed to stand, could revolutionize decades of evidentiary sufficiency analysis. If permitted to metastasize, it could transform every evidentiary sufficiency motion into an open-ended omnibus motion embracing dozens of adverse evidentiary rulings. We will not, however, open that gate.

The assessment of evidentiary sufficiency assumes that all of the evidence actually in the case is competent. It is not a vehicle for replaying all of the other rulings that may have been made in the course of the trial. If CSX objected to the expert opinions it now challenges, those objections were over-ruled. Those opinions, rightly or wrongly, are in the case and are, therefore, an inextricable part of what must be assessed when weighing evidentiary sufficiency.

CSX, not to mention an amicus brief from Maryland Defense Counsel, Inc., has spent so much time making weighty arguments against the admissibility of the expert opinions, however, that we may, as an act of grace, indulge it by framing, *nostra sponte*, an additional contention with respect to which those arguments will become material.

That additional contention, however, will remain absolutely separate and distinct. Any consideration of the admissibility of the expert opinions will be deferred until we reach the newly framed contention and will have no effect on our immediate appraisal of evidentiary sufficiency. Under no circumstance may these two very different contentions be collapsed into a single contention.

## B. The Expert Opinions and Evidentiary Sufficiency

■ Dr. Widmeyer's conclusion very definitely showed a causal connection between Miller's employment, particularly walking on large ballast, and the deterioration of his knees.

[T]hree things that he has been doing that have violated the abnormal position and the abnormal forces. *He has had a decade or so of walking on the irregular surface with the large rock. What that does, if any of you have ever walked on big rocks before, you wobble;* and like I showed you when I had the knee up there, *we're not talking about a single major tear of your joint. We're talking about gradually tugging on it and finally fatiguing it and stretching it out, which is what makes the arthritis.* That's how it works.

The second thing that he has added on top of that is the repetitive squatting in a position. The repeated squatting

that he did changing the air hoses and examining the train and that sort of thing had him in an abnormal position with his legs spread apart and bent down, *still slipping on the big rocks, that adds to the stress.*

And the last thing that he did—and like I said, any one of these things will do this, but getting on and off from something that's two-feet tall, to my mind, you have to jump to do that; and if you let yourself down, the knee that you're letting yourself down or climbing up from is in such an acutely tucked position that you're going to damage it.

So I don't think there's any question that *the activities that he did over ten-plus years have destroyed his knees.* (Emphasis supplied).

Dr. Shepard, when asked a hypothetical question that included the factor of walking on large ballast, rendered his opinion as to the causation of Miller's knee problems.

*I have read studies* including one done by Peter Kavanaugh on ankles and subtalar joints of the feet of people *where they compared, they studied the results and epidemiologically the biomechanical effects of walking on a ballast as well as other studies done in occupational groups were people who* climb, squat, kneel and *walk on uneven terrain.* And while these people are not conductors, the loads borne by their knees are similar to this gentleman. So in summary, *my opinion is he sustained* a knee meniscus tear which is not an acute injury but *an accumulation of chronic rubbing and grinding of the medial inner joint knee surfaces* as demonstrated on that x-ray, and two, *the arthritis in both knees was a production of his occupation* because he really did not have any other risk factors that I could recall. He wasn't obese. He's not particularly old. He wasn't somebody who played a lot of heavy-duty sports and he never had a really significant acute injury that he related to me.

(Emphasis supplied).

Dr. Andres's opinion concerned the general effect on the legs and knees of walking, over an extended period of time, on large mainline ballast.

The study, again, at Burlington Northern looked at just *walking on ballast* and found that *the total body forces were greater than walking on level ground.* At the very least, we're looking at—*even if this was not large rock, you're looking at two to four times body weight if this was a level surface.* So, certainly, *you are exerting force on the structures of the leg.*

*We found that walking on the large rock increased the motion of what we call the "rear foot,"* the back part of the foot, *dramatically and significantly over walking either on small rock or on just regular concrete.*

Q. And am I correct that *you did a study using main line ballast and walking ballast?*

A. *That's correct.*

(Emphasis supplied).

On the basis of all of this evidence, including the three expert opinions, the proof was abundantly sufficient to create a jury issue on the question of causation.

### Admissibility of Three Expert Opinions

We will, *nostra sponte,* deem as properly before us a contention that Judge Nance abused his discretion on three occasions as he permitted, respectively, 1) Dr. Widmeyer, 2) Dr. Shepard, and 3) Dr. Andres to offer opinion testimony as expert witnesses.

### A. The Framing of the Contention

CSX has mounted a weighty attack against the opinion testimony offered by the three experts. The amicus brief is addressed exclusively to that issue. Although we are not ultimately persuaded by these arguments, we are loath to dismiss them on the technicality that they, albeit arguably in a very commodious pew, are in the wrong church. Accordingly, we erect the ediface of this contention as a procedural shelter around that pew.

Our only trepidation, as we do so, is that other litigants on future occasions will ask us similarly to indulge them. ("Let

no act of kindness go unpunished.") Let it be clearly noted, therefore, that we are not in any way obliged to indulge appellants in this fashion, and we may never do so again. Our framing of this contention is a random good deed and not a precedent.

## B. State, Not Federal, Evidence Law Applies

■ In a FELA case being tried in a state court, the state court will apply federal substantive law but state procedural law, including the state law of evidence. As stated by *St. Louis Southwestern Railway Company v. Dickerson*, 470 U.S. 409, 411, 105 S.Ct. 1347, 84 L.Ed.2d 303 (1985):

As a general matter, FELA cases adjudicated in state courts are subject to state procedural rules, but the substantive law governing them is federal.

*Central Vermont Railway Co. v. White*, 238 U.S. 507, 511, 35 S.Ct. 865, 59 L.Ed. 1433 (1915), had earlier pronounced:

There can be no doubt of the general principle that *matters respecting* the remedy—such as the form of the action, sufficiency of the pleadings, *rules of evidence,— depend upon the law of the place where the suit is brought.*

(Emphasis supplied). See also *Kansas C.S.R. Co. v. Leslie*, 112 Ark. 305, 167 S.W. 83 (1914), *rev'd on other grounds*, 238 U.S. 599, 35 S.Ct. 844, 59 L.Ed. 1478; *Delong v. Maine C.R. Co.*, 136 Me. 194, 6 A.2d 431 (1939); *Avance v. Thompson*, 320 Ill.App. 406, 51 N.E.2d 334 (1943), *rev'd on other grounds*, 387 Ill. 77, 55 N.E.2d 57; *Atlanta Joint Terminals v. Knight*, 98 Ga.App. 482, 106 S.E.2d 417 (1958); *Rodriguez v. Denver & R.G.W.R. Co.*, 32 Colo.App. 378, 512 P.2d 652 (1973).

CSX erroneously argues on the basis of its assumption that the federal law of evidence is controlling in FELA cases in state courts. Without undertaking any sentence by sentence analysis of whether the federal evidentiary law being cited by CSX might correspond, coincidentally, with the Maryland law of evidence, we simply note that the pervasive reliance by CSX on 1) *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), a Supreme

Court case dealing exclusively with the federal law of evidence; 2) the Federal Rules of Evidence; and 3) lower federal court cases dealing with the federal law of evidence, is highly questionable.

In this regard, we view *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), as a tediously fact-specific "tempest in a teapot," in large measure over whether the term "gatekeeper" can be applied to characterize a judge ruling on the admissibility of expert opinion testimony. It is as if the term itself is loaded with some sort of magical cachet. The "tilt" of *Kumho Tire,* moreover, is completely out of alignment with Maryland's traditional inclination toward liberal admissibility. In any event, it is the Maryland law of evidence that is controlling in this FELA case, and it is to the Maryland law of evidence that we shall turn in arriving at a decision.

## C. Deferential Standard of Review Is Abuse of Discretion

As we assess the rulings on the opinions offered by the experts, it behooves us to remember that we are dealing with evidentiary calls, which are invariably to be reviewed by the deferential abuse of discretion standard. Judge Digges articulated the standard in *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977):

> [T]he admissibility of expert testimony is a matter largely within the discretion of the trial court and *its action will seldom constitute a ground for reversal.*

(Emphasis supplied). See also *Oken v. State,* 327 Md. 628, 659, 612 A.2d 258 (1992); *Giant v. Booker,* 152 Md.App. 166, 182 n. 9, 831 A.2d 481 (2003); *Myers v. Celotex Corp.,* 88 Md.App. 442, 460, 594 A.2d 1248 (1991). *Troja v. Black & Decker Mfg. Co.,* 62 Md.App. 101, 110, 488 A.2d 516 (1985), spoke to a similar effect.

> The decision to admit or exclude "expert" testimony is within the broad discretion of the trial court and that decision will be sustained on appeal unless it is shown to be manifestly erroneous.

See also *I.W. Berman Properties v. Porter Brothers, Inc.*, 276 Md. 1, 12–13, 344 A.2d 65 (1975).

## D. Expert Testimony Generally

The receipt of testimony from an expert is governed in Maryland by Rule of Procedure 5–702.

> Expert testimony may be admitted, in the form of an opinion or otherwise, *if the court determines that the testimony will assist the trier of fact* to understand the evidence or *to determine a fact in issue.* In making that determination, *the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education,* (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

(Emphasis supplied).

First and foremost under Rule 5–702, the witnesses must qualify as experts. After extensive voir dire as to their educational and professional backgrounds, all three were accepted as experts in this case. CSX not only does not challenge this but expressly agrees that Dr. Andres is a qualified ergonomist and that Dr. Widmeyer and Dr. Shepard are qualified orthopedists.

A second key factor is "the appropriateness of the expert testimony on the particular subject," to wit, whether it "will assist the trier of fact ... to determine a fact in issue." In this case, the fact in issue was the causal connection between 1) walking on an unstable surface, such as large ballast, over an extended period of time and 2) osteoarthritis of the knees. Drs. Widmeyer and Shepard testified as to that causation with respect to Miller, their patient, specifically. Dr. Andres testified to the ergonomic risk factors to the lower extremities from cumulative work-related trauma.

The causation of a progressive injury is a subject particularly appropriate for expert testimony. In *Giant Food v. Booker, supra,* 152 Md.App. at 180, 831 A.2d 481, Judge

Sharer discussed the problem of proving causation in the case of progressive injuries that do not manifest themselves immediately.

A claimant who was struck by a vehicle being operated by a fellow employee, while at his place of work, and who is immediately treated for a fracture of leg bones, need not necessarily provide expert medical evidence to support the causation conclusion. *Occupational diseases,* infections, *and other harm to internal tissue* or organs, however, *present a more esoteric question. A determination of causation in the latter category of cases by a jury of laypersons is less possible without the aid of medical evidence. It is particularly so,* as here, *when there has been a significant passage of time between the exposure and the onset of the disease and where there is lacking an obvious cause and effect relationship that is within the common knowledge of laymen.*

(Emphasis supplied).

In *S.B. Thomas, Inc. v. Thompson,* 114 Md.App. 357, 382, 689 A.2d 1301 (1997), this Court had similarly observed: *[T]he causal relationship will almost always be deemed a complicated medical question and expert medical testimony will almost always be required when* one or more of the following circumstances is present: 1) *some significant passage of time between the initial injury and the onset of the trauma;* 2) *the impact of the initial injury on one part of the body and the manifestation of the trauma in some remote part.*

(Emphasis supplied).

## E. Trisecting the Angle of Attack

It is the third factor mentioned in Rule 5–702, the "sufficient factual basis . . . to support expert testimony," at which CSX directs its fire. It seeks, moreover, to attack that threshold factor along three separate fronts. One of those attacks is that the testimony of the three experts failed the so-called *Frye–Reed* test of *Frye v. United States,* 293 F. 1013

(D.C.Cir.1923), and *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), in that the deductive techniques used by the three experts were not shown to have met with "general acceptance within the scientific community."

The other two prongs of attack find their provenance in the definitive analysis of expert opinion testimony made by Chief Judge Murphy for this Court in *Wood v. Toyota Motor Corporation,* 134 Md.App. 512, 760 A.2d 315 (2000). Inspired by *Wood v. Toyota,* CSX raises as its second subcontention the lack of an adequate factual basis for the expert opinions and as its third subcontention the lack, on the part of all three experts, of a reliable methodology in forming their opinions.

### 1. The *Frye–Reed* Test is Inapplicable

The *Frye–Reed* test has absolutely nothing to do with the conclusions of Miller's doctors that the etiology of his osteoarthritis was his years of walking on mainline ballast or with the conclusion of Dr. Andres that, as a general ergonomic phenomenon, years of walking on mainline ballast can be injurious to the lower extremities of human beings. As Judge Eldridge made very clear for the Court of Appeals in *Reed v. State,* 283 Md. at 380, 391 A.2d 364, the *Frye–Reed* test does not apply to expert opinions generally.

> No rule or set of rules could be expressed for all cases which would adequately distinguish helpful expert testimony from that which is superfluous or worse. Accordingly, *this Court has held that the determination of similar and related issues are generally matters within the sound discretion of the trial court.*

(Emphasis supplied).

■■■ It is only with respect to new and novel scientific techniques that a general, as opposed to case-by-case, assessment must be made.

> On the other hand, *with particular regard to expert testimony based on the application of new scientific techniques,* it is recognized that prior to the admission of such

testimony, *it must be established that the particular scientific method is itself reliable.*

... [I]f the reliability of a particular technique cannot be judicially noticed, it is necessary that the reliability be demonstrated before testimony based on the technique can be introduced into evidence....

The question of the reliability of a scientific technique or process is unlike the question, for example, of the helpfulness of particular expert testimony to the trier of facts in a specific case. *The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case.* It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion. Instead, considerations of uniformity and consistency of decision-making require that a legal standard or test be articulated by which the reliability of a process may be established.

283 Md. at 380–81, 391 A.2d 364 (emphasis supplied).

■■■ A doctor's opinion as to the etiology of his patient's arthritis is simply not the type of thing contemplated by the phrase "new and novel scientific technique." What is contemplated are new, and arguably questionable, techniques such as lie detector tests, breathalyzer tests, paraffin tests, DNA identification, voiceprint identification, as in the *Reed* case itself, and the use of polarized light microscopy to identify asbestos fibers, as in *Keene Corporation v. Hall,* 96 Md.App. 644, 626 A.2d 997 (1993).

Neither a specific medical nor a general ergonomic analysis of the stresses and strains that may cause long-term injury to the human body involves the type of new and novel scientific techniques calling for a *Frye–Reed* test. The opinion of this Court in *Myers v. Celotex Corp.,* 88 Md.App. 442, 594 A.2d 1248 (1991), *cert. denied, Fibreboard Corp. v. Myers,* 325 Md. 249, 600 A.2d 418 (1992), is directly on point. A medical expert testified that asbestos fibers had caused the plaintiff's cancer "even though he could not state that the theory he

espoused was generally accepted by the medical community." 88 Md.App. at 455, 594 A.2d 1248. On that basis, Celotex, even as does CSX in this case, moved to strike the testimony "on the basis that the theory was the doctor's personal opinion and not a theory that was generally accepted in the medical community." 88 Md.App. at 456, 594 A.2d 1248. The trial judge accepted the defense argument and, in a court trial, gave no credence to the expert opinion. This Court reversed that judgment for the defendant. Judge Bloom explained our rationale.

> The standard for the admissibility of medical expert opinion testimony is reasonable medical probability. The "generally accepted in the medical community" standard that was erroneously employed by the court in the case sub judice was adopted in Maryland in Reed v. State and generally applies to the admissibility of evidence based upon novel scientific techniques or methodologies. In that respect, it is perfectly logical and reasonable to insist that prior to the introduction of expert testimony on the validity of a new scientific technique (i.e., lie detector tests, breathalyzer tests, paraffin tests), it must first be established that the scientific technique has been generally accepted by the relevant scientific community as reliable.

> That exposure to asbestos may cause cancer, however, is not a novel or controversial assertion. ... Such testimony was based upon Dr. Schepers's personal observations and professional experience, and thus required only a reasonable degree of medical probability. The holding in Reed v. State has not been extended to medical opinion evidence which is not "presented as a scientific test the results of which were controlled by inexorable, physical laws."

88 Md.App. at 458–59, 594 A.2d 1248 (emphasis supplied). Judge Bloom, 88 Md.App. at 459–60, 594 A.2d 1248, added an exclamation point.

> Since the appropriate standard is reasonable medical probability, Dr. Schepers's professional opinion would be admissible even if the majority of his professional colleagues disagreed with it.

(Emphasis supplied). See also *Owens Corning v. Bauman*, 125 Md.App. 454, 498–500, 726 A.2d 745 (1999).

## 2. Adequate Factual Basis

 Although Rule 5–702's third factor inquires, without further differentiation, "whether a sufficient factual basis exists to support the expert testimony," that factor consists of two distinct sub-factors. It is first required that the expert have available an adequate supply of data with which to work. It is then required that the expert employ a reliable methodology in analyzing that data. These are distinct sub-questions of 1) supply and 2) execution. To the best of our research, it was the opinion of Judge Murphy in *Wood v. Toyota*, *supra*, that first articulated a distinction between these sub-issues, as he analyzed separately the sub-issue of "B. The 'Factual Basis' Issue," 134 Md.App. at 521–23, 760 A.2d 315, and then "C. The Methodology Issue," 134 Md.App. at 523–27, 760 A.2d 315.

Turning first to the adequacy of the factual basis, Rule 5–703(a) comes into play, as it provides:

*The facts or data* in the particular case upon which an expert bases an opinion or inference *may be* those perceived by or *made known to the expert at or before the hearing.* If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence.*

(Emphasis supplied). See also *Keene Corporation, Inc. v. Hall*, 96 Md.App. 644, 660, 626 A.2d 997 (1993).

We look first at the question of whether the three experts had sufficient data to permit them to offer expert opinions.

### A. Dr. Widmeyer and Dr. Shepard

Dr. Widmeyer, of the Roanoke Orthopedic Center, had been a medical doctor for 35 years. Most of his medical career was spent in orthopedic surgery and he was board-certified in that specialty. Over the years, he had treated approximately 65,000 patients with osteoarthritis. Dr. Widmeyer reviewed

the medical records of Miller, from his visit to the Bayview Center in 1997 through his partial knee replacement surgery in 2002. Dr. Widmeyer examined Miller in April of 2003 and took a complete medical history from him. Dr. Widmeyer also reviewed X-rays of Miller's knees taken by Dr. Seth in 2000, as well as Dr. Seth's medical records of Miller and an MRI scan of Miller's knees. Dr. Widmeyer described his personal examination of Miller's knees.

Q. Would you tell the jurors what you found from your examination?

A. If at all possible, I like to watch a patient when they can't see me so that we're sure we don't have somebody that's putting on a performance. I was able to see him come down the hall, and after he left, I was able to watch him go out in the parking lot and get in the car when he was not able to see me. Both times, he leaned very heavily on a cane to support his leg and he walked with a very obvious limp.

And *when I examined him, his left knee was swollen. He had already had his surgery by this time.* So he had the poke-hole scars from where they do the scope. That was what Dr. Shepard did first and then he had the other scar from where they did the partial knee replacement.

*His knee was swollen and it was tender, especially on the medial*—that's the inside where the collapse was—and it hurt him to straighten his knee all the way out and *I was not able to get him to bend it more than 90 degrees. He couldn't tuck it up.* And when you put your hand on his knee, *there was considerable crunching and grinding, which is referred to as crepitation.* That's just where the bones are grinding. Basically, he had a sick knee.

Q. Did you examine his right knee?

A. Yes.

Q. What were the findings in the right knee?

A. *The right knee was similar to the left, but it wasn't as far gone* and he had not had surgery on it. The right knee had swelling, which means it was irritated. *He had*

*the crepitation, the crunching, which is what the arthritis is all about,* and he had pain on the extremes of motion, but it wasn't restricted yet. *So he had an arthritic knee. It was just lagging behind the other one.*

(Emphasis supplied).

Dr. Widmeyer's medical diagnosis was bilateral "traumatic arthritis in both of his knees, the left worse than the right." Dr. Widmeyer was then asked a hypothetical question, which included all of the work-related information testified to by Miller and Reed and the stipulated testimony of Spencer. The hypothetical went on for approximately nine-pages of transcript. Over CSX's objection, Judge Nance ruled that Dr. Widmeyer had an adequate factual basis to permit him to offer an opinion as to the cause of Miller's osteoarthritis.

Dr. Shepard had been a practicing doctor for 30 years, specializing in orthopedic surgery. He was board certified in orthopedics and had worked extensively in the area of knee problems and knee replacement surgery. He regularly performed approximately 100 arthroscopies or knee surgeries per year. He had testified in court as an expert witness on numerous occasions. He had diagnosed and treated thousands of patients with osteoarthritis. He further estimated that approximately 40% of his osteoarthritis cases were occupation-related and were the result of repetitive injury.

Dr. Shepard first saw Miller as a patient on July 11, 2000. On that occasion Dr. Shepard took an extensive medical history from him. Several X-rays were also taken of Miller's knees. Dr. Shepard also gave Miller a physical examination, including extensive testing of Miller's knee movements and mobility.

Dr. Shepard testified that he had treated railroad conductors in the past and that he had actually visited some of the railroad yards. He was asked a hypothetical question, which included all of the work-related information given in the testimony of Miller and Reed and contained in the stipulated testimony of Spencer. Dr. Shepard had also read a number of studies of the epidemiological and "biomechanical effects of

walking on ballast as well as other studies done on occupational groups [of] people who climb, squat, kneel and walk on uneven terrain." Dr. Shepard observed that "while these people are not conductors, the loads borne by their knees [were] similar" to that borne by Miller.

Miller returned to Dr. Shepard for a second visit on July 24, 2000, as a result of which an MRI was taken of Miller's knees. Dr. Shepard performed an arthroscopy on Miller on August 16, 2000. On the basis of all of this data, particularly the arthroscopy, Dr. Shepard concluded:

A. [This] man's knee was plumb worn out and *I believe it was due to his repetitive kneeling, heavy lifting, climbing, walking on the uneven surfaces, in this case ballast,* jumping on and off cars as a result of his, what was required in his job.

Q. Doctor, *why is the rolling on this large ballast a precursor to osteoarthritis?*

A. *Because it places abnormal biomechanical stresses on your ankle and on your knee.* Good example is if you just ask the jury, I mean, if they just say walk on the right side of their foot just walk around, or stand on it, you're going to feel a stress going up your leg into your knee. And that's basically what happens. It transmits an abnormal force. *It will stretch out the ligament if you are always walking with your knee, you know, bent one way or the other which makes your knee unstable and tends to promote cartilage tears,* slippage of the joint *leading to arthritis.* Number two, it can lead to conditions not only in the ankle and mid-foot where, you know, your ligaments stretch out and you're prone to arthritis from abnormal stresses but it can lead to stumbling and slipping. It's really well documented and these people are always tripping and falling and that's also putting an abnormal biomechanical stress on their knee.

(Emphasis supplied).

Miller, after returning to work for almost two years, returned to Dr. Shepard in early 2002. There were more X-

rays. Dr. Shepard referred Miller to Dr. Thomas Whitten, who performed a left knee replacement.

## B. Dr. Andres

Dr. Andres testified as an expert in ergonomics, the study of the relationship between job requirements and the physical capacity of the human body. He received his Ph.D. in bioengineering from the University of Michigan and had been engaged in both research and the teaching of graduate courses in biomechanics since 1980. He has also directed research projects for the Occupational Safety and Health Administration (OSHA), the National Institute of Occupational Safety and Health (NIOSH), and the National Aeronautics and Space Administration (NASA). He had also done ergonomic consulting work for railroads. Since 1990, he had been an ergonomics consultant to a number of major industries, including the Ford Motor Company, Nissan, and Hitachi. Dr. Andres had published 53 articles on various ergonomic topics.

Dr. Andres was familiar with materials published by the Association of American Railroads (AAR) about "repetitive crouching, squatting, kneeling, and flexing of the ankle [as] primary actions contributing to compression and wear-and-tear of tissue of the lower extremities." He was personally familiar with the study itself and with most of the key scientists who prepared the study that lead to the AAR training manual. The risk factors identified in that study had received wide circulation in trade journals, textbooks, and journals in the field of ergonomics.

Dr. Andres was specifically familiar with knee osteoarthritis as a "cumulative trauma disorder." Dr. Andres also relied on a 1992 study by the Burlington Northern Railroad about the force exerted on the human leg and ankle as it dismounts from a slowly moving railway car. (At eight miles per hour, *e.g.*, the force on the foot as it hits the ground is 15 times the person's body weight.)

Dr. Andres had also been made aware of a number of letters of complaint to CSX by its employees about the

problem of walking on large ballast in the CSX yards. In a hypothetical question, Dr. Andres was also apprised of the testimony of both Miller and Reed and the stipulation of Spencer's testimony about yard conditions in the Baltimore area CSX yards. Dr. Andres was of the opinion that CSX did not measure up to the industry standard in ergonomics.

CSX did not have an ergonomics program that came up to the standards that reasonable employers in the industrial segment of our country have.

With respect to Miller's "exposure to risk factors for cumulative trauma disorders of the lower extremities," Dr. Andres described the material on which he based his conclusion.

[T]here are several levels of analysis that I performed. First of all, *I have observed these particular tasks that the conductors like Mr. Miller had to perform at a variety of locations* and I have determined that certain aspects of these tasks require the squatting or the kneeling or the bending of the leg, particularly the knee, on a repetitive basis.

*Those types of tasks* include the throwing of the old style of switch. They also include coupling of air hoses that tie the brakes together from car to car. They also include this climbing up and down on the ladders, which I've indicated the first step is anywhere from 24 to 32 inches above the ground, and *also included the walking on these large rocks.*

So I've documented that he has been exposed to those.

(Emphasis supplied).

He also had a copy of Miller's job description, supplied by CSX. He testified to his visits to CSX's Bayview, Locust Point, and Curtis Bay yards. He testified that he had observed conductors at work in yards for up to three hours at a time over the course of "the last six to seven years." He offered an opinion first as to the ergonomic factor of repetition.

Walking five miles a day, you're taking more than 12,000 steps per day. Multiply that out times the number of days

and the number of years, it's millions of steps that have been taken. So repetition is certainly present.

Q. There was testimony that these guys were working in excess of 300 days a year. If we do the math at 12,000 a day on 300 days, that's 3,600,000 a year?

A. Yes.

Q. Over a 12–year career, that would be how much?

A. It would be probably 40 million.

Dr. Andres analyzed the risk factor of repetitive walking on large ballast.

*The study* at Burlington Northern *looked at just walking on ballast and found that the total body forces were greater than walking on level ground.* At the very least, we're looking at—even if this was not large rock, you're looking at two to four times body weight if this was a level surface. So certainly, you are exerting force on the structures of the leg.

(Emphasis supplied).

Dr. Andres then referred to a study he himself had done about the effect of walking on large ballast. He referred as well to a similar study by Dr. Peter Kavanaugh, a professor at Penn State University. Both studies reached similar conclusions.

We found *that walking on the large rock increased the motion of what we call the "rear foot," the back part of the foot, dramatically and significantly over walking either on small rock* or on just regular concrete.

Q. And am I correct that *you did a study using main line ballast and walking ballast?*

A. *That's correct.*

(Emphasis supplied).

## C. The Medical Opinions

With particular respect to the medical opinions offered by Dr. Widmeyer and Dr. Shepard, the opinion of Judge McAuliffe for the Court of Appeals in *Meda v. Brown,* 318 Md. 418, 427–28, 569 A.2d 202 (1990), is dispositive.

It is apparent that each doctor relied in part on circumstantial evidence in reaching his opinion that Dr. Meda was negligent. *The defendant argues that this is impermissible—that because the experts who testified for the plaintiff could not identify with particularity the specific act of negligence and precise mechanism of injury, their testimony is mere speculation or conjecture. We do not agree ....*

. . . .

... The plaintiff's experts, armed with their fund of knowledge, drew certain inferences from the circumstances. Having examined the testimony of the experts, *we conclude that the trial judge did not err in permitting that testimony and allowing the doctors to base their opinions on a combination of direct and circumstantial evidence. The doctors recited in detail the physical facts they considered, and the medical facts they added to the equation to reach the conclusion they did. The facts had support in the record, and the reasoning employed was based upon logic rather than speculation or conjecture.*

(Emphasis supplied). See also *Myers v. Celotex,* 88 Md.App. 442, 458–59, 594 A.2d 1248 (1991); *Owens Corning v. Bauman,* 125 Md.App. 454, 498–500, 726 A.2d 745 (1999).

## D. A Sufficient Factual Basis Generally

CSX's arguments on this sub-issue are little more than baying at the moon. CSX acknowledged, for instance, that Dr. Andres had, *inter alia,* performed his own study of rear foot motion and the adverse effect on ankles, legs, and knees of repetitive stepping on unstable surfaces, such as large mainline ballast. CSX does not suggest how its denigration of that research as "one lone, biased study" goes to admissibility rather than only to weight. Nor does CSX conjecture into what glowing endorsement its demeaning participle "biased" will be transformed, in that prism of review in which evidence magically takes on the coloration most favorable to the prevailing party. On this issue, it is Miller who gets to choose the adjectives.

The fatal flaw of CSX's attack on the adequacy of the factual basis for the experts' opinions is its complete misreading of what this Court did in *Wood v. Toyota, supra.* No less than three times, CSX totally mischaracterizes, perhaps disingenuously, what this Court actually held in that case. CSX asserts, "this Court excluded expert testimony where there was a lack of factual predicate." This Court, to the contrary, never excluded any expert testimony. CSX asserts, "this Court [held] that the engineer in *Wood* was not qualified to express an opinion as to defective design of an airbag." This Court, to the contrary, never held that the engineer was not qualified to express an opinion. CSX asserts, "Even with these facts, the Court held that the expert lacked a sufficient factual basis." This Court, to the contrary, never held that the expert lacked a sufficient factual basis.

An arguably disparaging allusion to "knowledge derived from employment as a litigation consultant," moreover, was by no means tantamount to "hesitancy" on our part to treat testimony based on such knowledge as admissible. A wry comment is not a legal prohibition.

### E. The Core Meaning of *Wood v. Toyota*

To begin to compare *Wood v. Toyota* with the present case, one must keep in the forefront of the mind the single salient fact that, whereas Judge Nance in this case ruled the three expert opinions to have been admissible, the trial judge in *Wood v. Toyota* ruled the single expert opinion to have been inadmissible. The significance of that result is to be found not in any decision by us as to the expert opinion *per se* but in the highly deferential abuse-of-discretion standard that we applied to the trial judge's evidentiary rulings. Judge Murphy went out of his way in *Wood v. Toyota,* 134 Md.App. at 520 n. 8, 760 A.2d 315, to point out that whether the decision is to admit or to exclude expert testimony, the trial judge's discretionary decision "will seldom constitute a ground for reversal."

> *The "admissibility of expert testimony is a matter largely within the discretion of the trial court* and *its action will seldom constitute a ground for reversal."* "The decision to

admit or exclude 'expert' testimony is within the broad discretion of the trial court and that decision will be sustained on appeal unless it is shown to be manifestly erroneous."

(Emphasis supplied). Immediately prior to announcing that standard of review, moreover, he had announced the actual holding of the case in a single sentence.

*We are not persuaded,* however, *that Judge Hotten's decision constituted an* unfairly prejudicial *abuse of discretion.*

134 Md.App. at 519–20, 760 A.2d 315 (emphasis supplied). After a thorough discussion of the factual basis sub-issue, Judge Murphy concluded:

It is well settled that the trial judge—not the expert witness—determines whether there exists an adequate factual basis for the opinion at issue. *Madden v. Mercantile-Safe Deposit & Trust Co.,* 27 Md.App. 17, 44, 339 A.2d 340 (1975). *We are not persuaded that Judge Hotten was clearly erroneous in finding that Mr. Leshner's opinion was based on an incomplete factual predicate.*

134 Md.App. at 523, 760 A.2d 315 (emphasis supplied).

In *Wood v. Toyota* this Court did not exclude the testimony of the expert nor hold that he lacked a sufficient factual basis for his opinion. We did not, to be sure, hold, as a matter of law, that there was a sufficient factual basis for the expert's opinion. Had we done so, we would have reversed the trial judge for having abused her discretion. We did not. Neither, on the other hand, did we hold, as a matter of law, that there was not an adequate factual basis for the opinion. That question was not before us.

As a rudimentary principle of sound legal method, litigants must be extremely circumspect in drawing conclusions from the affirmance of a discretionary call. In all statistical likelihood, we were, in *Wood v. Toyota,* dealing with that 80% bulge of the bell-shaped curve wherein the trial judge, within her discretion, could have gone either way and still been affirmed. Just because we affirm a judge's discretionary decision to exclude an expert opinion does not necessarily mean that we,

on precisely the same facts, would not also affirm the decision of another judge to admit the opinion.

In *Wood v. Toyota*, we held nothing with respect to the qualification of the expert. We simply held that the trial judge had not abused her discretion in ruling as she did. We held nothing with respect to the adequacy of the factual basis for the expert opinion. We simply held that the trial judge had not abused her discretion in ruling as she did. In that part of the opinion dealing with the reliability of the methodology used by the ostensible expert, our analysis and its unmistakable tone, do, to be sure, make it much more likely that we would, had it been necessary, have held the expert's methodology to have been unreliable, as a matter of law. Even that, however, calls for speculation, for that question was not before us. Our opinion on the sub-issue of the adequacy of the factual basis for the expert's opinion, on the other hand, does not give rise to the same speculation. We affirmed the trial judge's exercise of discretion and that was it.

## F. The Discretionary Range is Broad

In a case such as this, in which Judge Nance ruled that the expert opinions were admissible, a much more reliable precedential benchmark would be Chief Judge Murphy's opinion for this Court in *Hall v. State*, 107 Md.App. 684, 670 A.2d 962 (1996). In that case, the expert in clinical social work had observed the abused child's displaying of anger; had learned that the child had been lying, stealing, and had been "accused of acting out sexually in his previous foster home;" and suffered from major depression. 107 Md.App. at 687–88, 670 A.2d 962. From that essentially ambiguous factual predicate, particularly in a case in which the burden of persuasion was beyond a reasonable doubt, the expert offered the opinion that the child's conduct was "strongly associated with his being a victim of child sexual abuse."

Q. These disorders that you noted in [the victim's] major depression and conduct disorder, *could you testify* to a substantial degree of psychological certainty *that they were*

*basically caused by his being a victim of child sexual abuse?*

. . . .

. THE WITNESS: *I would say that they are strongly associated with his being a victim of child sexual abuse.*

Q. And upon what facts and circumstances do you base that conclusion, that opinion?

A. Because of the way in which [the victim] presented his information to me. When he came in acting out, very angry, wasn't going to talk to me or to anyone else, and he was going to walk about and all of that.

107 Md.App. at 688–89, 670 A.2d 962 (emphasis supplied).

In holding that an expert opinion was admissible even if its factual basis was only enough to show that a causal relationship was possible, rather than probable, this Court, 107 Md. App. at 693, 670 A.2d 962, quoted with approval from *Langenfelder v. Thompson*, 179 Md. 502, 505, 20 A.2d 491 (1941):

> *The opinion of an expert as to even the possibility of the cause* of a certain condition may frequently be of aid ... for when the facts tend to show ... the cause of the condition, *the assurance of an expert that the causal connection is scientifically possible may be helpful* in determining what are reasonable inferences to be drawn from the facts.

*Langenfelder v. Thompson*, 179 Md. 502, 505, 20 A.2d 491 (1941). In *Langenfelder* and in *Hughes v. Carter*, 236 Md. 484, 486, 204 A.2d 566 (1964), the Court of Appeals held that a physician was entitled to express *an opinion that the plaintiff's injuries could have resulted* from an auto accident. In *Wantland v. State*, 45 Md.App. 527, 413 A.2d 1376 (1980), this court held that *an expert was permitted to opine that a particular knife could have caused the victim's wounds.*

(Emphasis supplied).

In *Ali v. State*, 314 Md. 295, 310, 550 A.2d 925 (1988), the Court of Appeals approved an expert opinion that showed a possible causal connection.

The State was offering the testimony of an expert to show that these drugs *could,* and were known to, cause this effect upon a person such as [the victim]. This information was relevant, and potentially useful to the jury.

(Emphasis in original). See also *Simmons v. State,* 313 Md. 33, 48, 542 A.2d 1258 (1988); *Yount v. State,* 99 Md.App. 207, 219, 636 A.2d 50 (1994) (expert permitted to testify that it is "normal and very common" for abused children to recant their initial reports of child abuse).

Actually, the combined effect of *Wood v. Toyota* and *Hall v. State* is to send a collective message that neither opinion alone could convey. The factual basis for the expert opinion in *Hall* was relatively skimpy; yet we did not hesitate to affirm the discretionary decision to admit it. The factual basis for the opinion, in contrast to the reliability of its methodology, was actually more detailed in *Wood v. Toyota* than in *Hall;* yet we did not hesitate to affirm the discretionary decision not to admit it.

If the focus of the two opinions were, improperly, on expert opinions *per se,* the two results might appear to be contradictory. If the focus, however, is, properly, on the broad discretion entrusted to trial judges on evidentiary rulings, the two opinions, in harmony, communicate the desired message. One judge may admit an opinion on a lesser predicate while another judge rejects an opinion on a greater predicate, and both will be affirmed for operating within their legitimate discretionary range. That apparent anomaly, by definition, is an accepted consequence of discretion, and there is no disharmony or incongruity between the two results.

CSX also cites *Stasior v. National Railroad Passenger Corp.,* 19 F.Supp.2d 835 (N.D.Ill.1998), a case in which the bases for two expert opinions did not bear any resemblance to the bases for the three expert opinions in this case. *Stasior,* moreover, is based on federal evidence law and especially on *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* neither of which, as we have already pointed out, applies in a FELA case in a state court.

## G. A Sufficient Factual Basis

We hold that all three of Miller's experts had an abundant factual basis for the opinions they offered. See *Beatty v. Trailmaster Prod., Inc.*, 330 Md. 726, 741, 625 A.2d 1005 (1993); *Giant v. Booker*, 152 Md.App. 166, 181–88, 831 A.2d 481 (2003); *Troja v. Black & Decker Mfg. Co.*, 62 Md.App. 101, 110, 488 A.2d 516 (1985).

The factual basis for each of the three challenged expert opinions in this case was, we hold, significantly more substantial than that in *Hall v. State*. In *Hall*, we did not hold that the factual basis for the opinion was necessarily adequate, as a matter of law. We simply held that the trial judge who had ruled it to be adequate was operating within her discretionary range. That is all we are required to do with respect to Judge Nance's discretionary rulings in this case, and we do not hesitate to do so.

### 3. Reliable Methodology

It is not always possible to draw a clean line of demarcation between the sub-issue of an adequate factual basis for an expert opinion and the sub-issue of a reliable methodology. At the edges, the two inevitably overlap and blur into each other. The respective centers of gravity, however, are nonetheless distinct.

In *Wood v. Toyota, supra*, we affirmed the ruling of the trial judge to exclude an expert's opinion because, *inter alia*, there was no evidence that the expert had employed a reliable methodology. In that part of his opinion dealing with methodology, Judge Murphy 1) assumed that the expert was qualified and 2) assumed that there was an adequate factual basis for the opinion. What was still lacking was an adequate theory or rational explanation of how the factual data led to the expert's conclusion. Judge Murphy pointed out:

> *Mr. Leshner never explained how the data upon which he relied led him to the conclusion* that the size of the vent holes caused appellant's injuries. No trier of fact could conclude that vent holes in an air bag caused an injury

merely because an expert said that they did. *Mr. Leshner's theory provided no rational explanation for why the size or location of the vent holes had anything to do with the injuries that appellant sustained.*

134 Md.App. at 523–24, 760 A.2d 315 (emphasis supplied).

We quoted *Beatty v. Trailmaster, supra,* and reaffirmed that an expert opinion must provide a sound reasoning process for inducing its conclusion from the factual data.

> In *Beatty v. Trailmaster,* 330 Md. 726, 625 A.2d 1005 (1993), *the Court of Appeals affirmed a summary judgment entered against a plaintiff who proffered the testimony of a qualified expert who could offer no "scientific evidence ... [or] sound data to buttress his opinion."* In that case, the expert had in essence furnished a "because I say so" explanation for his conclusion that a device installed on a motor vehicle was "unsafe." The *Beatty* Court rejected that explanation on the ground that "[o]ur cases hold that *'an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant.'"*

134 Md.App. at 525, 760 A.2d 315 (emphasis supplied).

We cited, 134 Md.App. at 526, 760 A.2d 315, with approval, *Demaree v. Toyota Motor Corp.,* 37 F.Supp.2d 959, 963–65 (D.Ky.1999), which rejected an expert opinion that "was based solely on conjecture and speculation and was not grounded in any scientific bases," and *Britt v. Chrysler Corp.,* 699 So.2d 179, 180–82 (Ala.Civ.App.1997), which rejected an opinion because "the expert did not provide an adequate explanation for the basis of his opinion." See also *Giant v. Booker,* 152 Md.App. 166, 183–85, 831 A.2d 481 (2003) ("[W]e must determine ... if his testimony was the product of reliable principles and methods."). And see *Oken v. State,* 327 Md. 628, 660–61, 612 A.2d 258 (1992); *Potomac Electric Power Co. v. Smith,* 79 Md.App. 591, 645–46, 558 A.2d 768 (1989); *Thomassen Lincoln–Mercury, Inc. v. Goldbaum,* 45 Md.App. 297, 305, 413 A.2d 218 (1980) ("Appellant's complaints about the manner in which [an expert witness] derived and stated his opinion as to

value go to the weight to be accorded his testimony rather than to its admissibility.").

## A. Dr. Widmeyer and Dr. Shepard

Both Dr. Widmeyer and Dr. Shepard were well qualified, board-certified orthopedic surgeons, who had treated thousands of patients with osteoarthritis. Each examined Miller personally, Dr. Shepard on a number of occasions. Dr. Shepard actually performed an arthroscopy on Miller's left knee. Each reviewed Miller's medical records, from Dr. Seth and from the Bayview Medical Center. Dr. Widmeyer reviewed Dr. Shepard's records. Each examined X-rays and MRI scans of Miller's knees. Each took a full medical history from Miller. Each had the benefit of a hypothetical question reciting the details of Miller's work history and daily work habits and routines.

Dr. Shepard, moreover, 1) had visited railroad yards, 2) had treated railroad conductors in the past, and 3) had read a number of studies of the epidemiological and "biomechanical effects of walking on ballast as well as other studies done on occupational groups [of] people who climb, squat, kneel and walk on uneven terrain."

The reasoning process that went into their diagnoses of Miller's ailment and its likely cause was impeccable. *Meda v. Brown, supra; Myers v. Celotex, supra; Owens Corning v. Bauman, supra.* Although CSX complains that neither doctor had conducted studies on the effect of walking on ballast, Dr. Widmeyer and Dr. Shepard testified as physicians, not as ergonomic experts.

■■■ CSX points out that the methodology employed by doctors is "differential diagnosis." That is a scientific method that laymen would refer to as the process of elimination. Once the doctor observes and diagnoses the present condition of Miller's knees, he then considers the four or five recognized causes for such a condition. From the medical history and work history of Miller, he can then eliminate those possible causes that are less likely and focus upon the one that is most

likely. Both doctors ruled out genetics, obesity, acute trauma, and other causes of osteoarthritis except cumulative trauma. There is nothing improper or unreliable in such a methodology, particularly in a FELA case, in which the scales are tilted toward liberal admissibility.

CSX complains that the doctors did not eliminate the etiological contribution that Miller's walking on mainline ballast, not in the yards but out on the mainline, may have made to his injury. It is of no legal significance, however, that Miller's walking on mainline ballast in the yards was only part, but not all, of his cumulative trauma, for as *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), pointed out with respect to FELA cases:

> *[T]he test* of a jury case *is simply whether* the proofs justify with reason the conclusion that *employer negligence played any part, even the slightest, in producing the injury* or death for which damages are sought. *It does not matter that,* from the evidence, *the jury may also with reason, on grounds of probability, attribute the result to other causes.*

(Emphasis supplied). *Aparicio v. Norfolk & Western Railway Co.*, 84 F.3d 803, 812 (6th Cir.1996), similarly observed:

> The test of causation in Federal Employers' Liability Act cases is whether an employer's actions played *any part at all* in causing the injury.

(Emphasis in original).

The definitive analysis of the use of differential diagnosis by a physician was made by the United States Court of Appeals for the Fourth Circuit in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir.1999). The defendant there, as CSX here, challenged the admissibility of the medical expert's diagnosis of the plaintiff's injury and its cause.

GGAB contends that Dr. Isenhower's testimony was inadmissible because it was not based on reliable scientific methodology. *This is so, it argues, because Dr. Isenhower had no epidemiological studies, no peer-reviewed published studies, no animal studies, and no laboratory data to support a conclusion that the inhalation of talc caused*

*Westberry's sinus disease. ... Dr. Isenhower merely relied on a differential diagnosis ...* in reaching the conclusion that Westberry's sinus problems were caused by his exposure to talc. *GGA maintains that a differential diagnosis ... is [not] sufficient to establish the reliability of Dr. Isenhower's opinion. We disagree.*

178 F.3d at 262 (emphasis supplied).

The Fourth Circuit, 178 F.3d at 262–63, explained that differential diagnosis in a reliable methodology and pointed to its "overwhelming" acceptance in the medical community.

Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. *A reliable differential diagnosis typically,* though not invariably, *is performed after "physical examinations, the taking of medical histories, and the review of clinical tests,* including laboratory tests," *and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is most likely. This technique "has overwhelming acceptance in the medical community,* has been subject to peer review, and does not frequently lead to incorrect results." We previously have upheld the admission of an expert opinion on causation based upon a differential diagnosis. *And, the overwhelming majority of the courts of appeals that have addressed the issue have held that a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the first prong of the Rule 702 inquiry.* Thus, we hold that a *reliable differential diagnosis provides a valid foundation for an expert opinion.*

(Emphasis supplied).

CSX complains that Dr. Widmeyer and Dr. Shepard did not rely for their diagnoses on scientific literature or scientific

tests. The *Westberry* opinion is also illuminating as to such a contention.

> [W]hile *precise information* concerning the exposure necessary to cause specific harm to humans *and exact details pertaining to the plaintiff's exposure* are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and *need not invariably provide the basis for an expert's opinion on causation.*

178 F.3d at 264 (emphasis supplied).

CSX takes particular umbrage at what it characterizes as a less than convincing elimination of several alternative causes. Again, *Westberry* sheds light on such a contention.

> *[A] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness.* The *alternative causes* suggested by a defendant *affect the weight* that the jury should give the expert's testimony *and not the admissibility of that testimony.* ...
>
> ... *Dr. Isenhower's alleged failure to account for all possible alternative causes* for Westberry's sinus problems *did not prohibit the admissibility of his opinion* as to causation.

178 F.3d at 265–66 (emphasis supplied).

*Hardyman v. Norfolk and Western Railway Co.,* 243 F.3d 255 (6th Cir.2001), was a FELA case in which the trial court had excluded an expert opinion by the plaintiff's physician. The Sixth Circuit reversed the trial court. It expressly approved of differential diagnosis as a technique for determining causation.

> *One appropriate method for making a determination of causation for an individual instance of disease is known as "differential diagnosis,"* which is the method employed by Plaintiff's experts in this case. "Differential diagnosis" is defined as:
>
> [t]he method by which a physician determines what disease process caused a patient's symptoms. *The physician*

*considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history.* 243 F.3d at 260 (emphasis supplied).

In that case, a railroad brakeman was suffering cumulative work-related trauma that manifested itself as carpal tunnel syndrome. The Sixth Circuit pointed out, 243 F.3d at 265, that causation can be determined by a physician's differential diagnosis and does not require an epidemiological study or a study conducted on the precise type of employee involved in the suit.

[I]t makes little sense to require a plaintiff to establish a dose/response relationship or threshold level in a situation where there has been no scientific study conducted specifically on railroad brakemen and where the dose/response relationship or threshold level will always vary from individual to individual. *Such a requirement essentially would foreclose plaintiffs from recovering for CTS against negligent employers unless their particular job has been the subject of a national, epidemiological study* on CTS.

(Emphasis supplied).

We hold that Judge Nance did not abuse his discretion in ruling that the opinions of Dr. Widmeyer and Dr. Shepard were based on reliable methodologies.

## B. Dr. Andres

CSX claims that Dr. Andres should not have been permitted to give an expert opinion as to the ergonomic risks associated with CSX's Baltimore area rail yards because his methodology was not reliable. It will not be enough for CSX to persuade us that Dr. Andres's methodology was not, as a matter of fact, ultimately reliable. CSX faces the far more daunting task of convincing us, as a matter of law, that his methodology was not even **arguably** reliable and that any judge who could even think otherwise would be guilty, *ipso facto*, of an abuse of discretion. Since we would find, were the question before us, that Dr. Andres's methodology was, as a

matter of fact, impeccably reliable, *a fortiori*, we hold, as a matter of law, that Judge Nance did not abuse his discretion in so finding.

Although Dr. Andres's testimony inevitably confirmed and reinforced the already abundant proof of causation, it was offered primarily to prove 1) the existence of ergonomic risk factors to the lower extremities of employees in railroad yards, 2) the existence of known remedial measures to ameliorate those ergonomic risks, and 3) CSX's knowledge of both the ergonomic risks and the available remedial measures. The type of foreseeability or notice on the part of CSX that Dr. Andres was testifying to was well described by *Aparicio v. Norfolk & Western Railway Co.*, 84 F.3d 803 811–12 (6th Cir.1996), a case in which Dr. Andres was, coincidentally, also an expert witness for the plaintiff.

> The testimony of Dr. Robert Andres, Aparicio's ergonomics expert, shows that *there were ergonomic risk factors and known remedial measures that had been described and accepted by the scientific community. This information was widely published in trade and scientific journals.* A jury could accept Dr. Andres' testimony and find that *a reasonably prudent employer would have known about the risk factors and taken steps to ameliorate them.* In addition, the law does not impose a duty on an employer to address a safety hazard or risk only in the event that a similar injury has occurred before from the same cause.

> ... Dr. Andres testified as to the risk factors accepted in the biomechanical and ergonomics community for upper extremity cumulative trauma disorders.... Dr. Andres also testified that *an industrial employer like Norfolk & Western would learn of these ergonomic risk factors, as well as of methods of determining whether an employee was exposed to a risk of injury and methods of amelioration,* through scientific and professional publications, trade journals and industry publications. Further, Dr. Andres stated that *an employer like Norfolk & Western would know of the*

*ergonomic literature through its medical department or safety person.*

(Emphasis supplied).

CSX acknowledges that Dr. Andres had conducted a study on the effects on the lower extremities of walking on large ballast and that Dr. Andres was also familiar with a similar study by Dr. Peter Kavanaugh. CSX seems to assume that both of those studies will magically evanesce when it tells us that they were "funded by plaintiffs' law firms" or that they were "litigation inspired." They, of course, will not disappear from the record, and they confirm the reliability of Dr. Andres's methodology.

CSX complains that Dr. Andres "had never observed a conductor for one full day" and that he "did not quantify how many times Miller or any yard conductor performed a task or activity in a given day." What Dr. Andres testified to was that he had visited CSX's Bayview, Locust Point, and Curtis Bay yards; that he had observed conductors at work in yards for up to three hours at a time; and that he had done this over the course of "the last six to seven years." In terms of quantifying the repetition of a task that ultimately produces cumulative trauma, if such serves a purpose, CSX is dismayed that "the longest period of time [Dr. Andres] had observed a worker [was] approximately two to three hours." We are betraying perhaps our ergonomic ignorance when we observe that if one knows the number of steps and kneebends and squats that a worker takes or makes in three hours and wishes to calculate the number of such phenomena that occur over the course of an eight-hour day, one multiplies the three-hour total by 2.67. That, for better or for worse, is what we would do and, for the moment, it is our call. Q.E.D.

To the extent to which Dr. Andres's testimony contributed to the proof of causation, CSX argues that Dr. Andres had inadequate information about Miller himself. What Dr. Andres had available, however, was extensive knowledge about what happened to the lower extremities generally of yard conductors, like Miller, when they walked on large ballast, like

that present in CSX's Baltimore area railyards. That the deductive process entails two steps, as it moves from the general to the specific, does not erode its validity. Dr. Andres had, moreover, both a job description for Miller, supplied by CSX, and a hypothetical question that went into extensive detail about the number of times Miller performed particular tasks per day over the course of 20 years. The complaint founders.

CSX finally complains about the reliability of Dr. Andres's methodology because his study and the others on which he relies relate to ergonomic risks to lower extremities general-ly—to feet, ankles, legs, knees, and hips—rather than focus on osteoarthritis of the knee specifically. In that regard, *Green v. River Terminal Ry. Co.*, 763 F.2d 805, 808 (6th Cir.1985), a FELA case, has pointed out:

> *[T]he test for foreseeability does not require that the negli-gent person should have been able to foresee the injury in the precise form in which it in fact occurred.* Rather, it is sufficient if the negligent person might reasonably have foreseen that *an* injury might occur.

(Emphasis supplied).

*Del Raso v. Elgin, Joliet and Eastern Railway Co.*, 84 Ill.App.2d 344, 228 N.E.2d 470, 479 (1967), another FELA case, similarly observed:

> It is common knowledge that fumes from burning paint often carry noxious and toxic gases which can through constant exposure cause illness. From this it can be rea-soned that since *it is not necessary that the tortfeasor foresee the particular harm which befalls plaintiff, but that the tortfeasor saw or should have seen the general danger and take precautions;* therefore, the defendant in the in-stant case cannot maintain that because the specific hazard of lead poisoning was not foreseen, defendant was not generally failing to act with due care for the safety of the plaintiffs.

(Emphasis supplied).

*Aparicio v. Norfolk & Western Railway Co., supra,* yet another FELA case, has also noted:

[A] railroad need not anticipate that an injury *would result* from its actions, but must only reasonably anticipate that the injury is *likely* to result. Aparicio has presented more than a scintilla of evidence tending to prove that Norfolk & Western could reasonably have anticipated that a track laborer such as Aparicio working with the tools he was assigned to use was likely to develop an upper extremity cumulative trauma injury.

84 F.3d at 814 (emphasis in original). See also *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 120, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) ("It is widely held that *for a defendant to be liable for consequential damages he need not foresee the particular consequences of his negligent acts:* assuming the existence of a threshold tort against the person, then whatever damages flow from it are recoverable.") (emphasis supplied).

The methodology employed by Dr. Andres passed muster, and Judge Nance did not abuse his discretion in permitting Dr. Andres to offer his expert opinion.

### Relevance and Hearsay

CSX's fifth and final contention concerns two of Judge Nance's rulings on the admissibility of challenged evidence offered by Miller. For the purpose of proving that CSX, in terms of its obligation to provide a safe and healthy workplace for its employees, had notice of the possible problems posed by the use of large ballast, Miller offered the videotaped depositions of Robert Edward Jenkins and Robert Benjamin Howe. CSX objected to the testimony of both witnesses, initially on the ground that their testimony would be irrelevant. Judge Nance overruled the objection.

The controlling law is Maryland Rule 5–402, which provides:

Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, *all relevant evidence is admissible. Evidence that is not relevant is not admissible.*

(Emphasis supplied).

Rule 5–401, in turn, tells us what "relevant evidence" is.

"Relevant evidence" means *evidence having any tendency to make the existence of any fact that is of consequence* to the determination of the action *more probable* or less probable *than it would be without the evidence.*

(Emphasis supplied).

CSX also argues a "back-stop" sub-contention. It maintains that even if the challenged testimony is deemed to be relevant, it should nonetheless have been excluded on the ground that "the danger of unfair prejudice" outweighed the testimony's "probative value." It invokes Rule 5–403, which provides:

> *Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,* confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

(Emphasis supplied).

As no more than a "throw-in" sub-contention, CSX also argues that the "majority of their testimony was hearsay and was therefore inadmissible." That sub-contention makes pertinent Rule 5–801(c), which defines "hearsay."

> *"Hearsay" is a statement,* other than one made by the declarant while testifying at the trial or hearing, *offered* in evidence *to prove the truth of the matter asserted.*

(Emphasis supplied).

## A. Preservation

Notwithstanding a 950–page record extract, we are searching for a needle in a haystack to find out where precisely Judge Nance made the evidentiary rulings that CSX now challenges and, more particularly, the precise reasons CSX advanced before Judge Nance to strike the testimony. We do find on the morning of the sixth trial day, July 21, 2003, the following unhelpful allusions to something that may or may not exist. As Miller was in the process of introducing the two videotapes, CSX objected:

MR. CAPLIS: This is all done subject to our motion that they be excluded in their entirety for the reasons that (inaudible).

MR. CAPLIS: Well, just for the record, I need to say this is being played subject to our objection to exclude it in its entirety.

MR. CAPLIS: Just that the defendant would move to strike the video of Mr. Jenkins for the reasons stated in its motion.

MR. CAPLIS: Just that the defendant then renews its motion to exclude the video of Mr. Howe for the same reasons in its motion.

Judge Nance denied both motions to strike the testimony. Although reasons had ostensibly been given for the ostensible earlier motions to strike, we have no idea what those reasons were.

We are going to give CSX the benefit of the doubt and assume that in some motion, if it existed, not included in the record extract, CSX raised those objections to the videotaped depositions that it had earlier raised at the depositions themselves. At the very outset of both depositions, CSX did move to have the entire testimony of the witness excluded 1) because it was irrelevant and 2) because it was hearsay. Accordingly, we shall treat both of those bases for the challenge as properly before us.

On the other hand, we find no reference to an objection having been made at any time on the basis of Rule 5–403 and the idea that relevance was outweighed by unfair prejudice. On July 16, the third day of trial, there was a scheduling discussion, in the course of which Judge Nance mentioned the Jenkins and Howe videotaped depositions. CSX voiced some specific objections to particular questions and answers. The thrust of the objections was that the testimony was not relevant, although the word "hearsay" was several times used. Once, however, reference was made to a so-called "global objection" to the depositions as a whole. Our search of this lengthy record extract, however, has failed to reveal any such

"global objection" or any ruling thereon (the briefs have not assisted us in this search). In short, the record extract does not reflect any mention of Rule 5–403 or of any balancing between probative value and unfair prejudice. We hold that that basis for the present contention appears to be nothing more than appellate opportunism. It has not been preserved for appellate review.

## B. Testimony of Robert Jenkins

Jenkins was a former employee of CSX, who had worked as a switchman and yard conductor in Jacksonville, Florida. He had worked for CSX or one of its predecessors from 1962 through his retirement in 1995. When Jenkins first went to work, the surface on which he walked consisted of small ballast. In approximately the mid–1970's, the surface began to be changed from one composed of small ballast to one composed of larger or mainline ballast. As a local union chairman beginning in 1981, Jenkins received a number of "bitter complaints" from fellow employees about having to walk on mainline ballast. He talked to management and achieved some amelioration of the problem.

Q Were you successful with your complaints?

A Some, because *the local management knew it was a problem* and they started taking some what they described as walking ballast, which is about an inch or less, and laying it along some of the leads where the men would work all day as engaged in processing a train, classifying it.

(Emphasis supplied).

In May of 1984, Jenkins, on behalf of the employees, wrote an official letter of complaint about the ballast to the terminal superintendent. That letter read:

"Request that the company place a small rock screening on top of the large, heavy rock type ballast that can now be found on most switching leads of the Jacksonville terminals. *After much discussion with many members of this committee, this chairman's convinced of the following: A, damage*

to feet; B, damage to legs; C, wear and tear of the knee joints; D, wear and tear of the ankle joints.

"It is also the view of this committee that in some instances that the above-described conditions could result into premature retirement."

(Emphasis supplied).

Jenkins testified that an increasing number of employees were complaining about "their legs hurting and their feet hurting, their joints." Jenkins also testified about similar conditions at the CSX's Baldwin Yard, about eighteen miles west of Jacksonville. He described a meeting with the terminal superintendent.

Q *Did you ever have any direct discussions with Mr. R.C. Walker about the large ballast?*

A *Yes, sir, I did.*

Q *What was his reaction?*

A *He knew the problem, that there was a problem there.*

Q How do you know that he knew there was a problem there?

A Because he told me.

Q What, specifically, did he say?

A He said he'd hate to work there under them conditions. Actually doing the work. Now, of course, the terminal superintendent didn't do that work themselves.

(Emphasis supplied).

Jenkins himself slipped and fell on mainline ballast and retired because of that "on-the-job injury." He required knee surgery on his right knee.

## C. Testimony of Robert Benjamin Howe

Howe was still a CSX employee and had been an employee since 1978, working first as a switchman and then as a yard conductor in the CSX yard in Hamlet, North Carolina. Howe described how, in 1990 or 1991, the surface of that yard changed from one consisting of small ballast or cinders to one composed of large or mainline ballast. Since 1987, Howe had

been the Local Chairman of the United Transportation Union. In that capacity, he received the grievances of his fellow employees and then communicated their problems to the CSX management.

Howe described his receiving of complaints about the mainline ballast and his passing on of these complaints to management.

*[W]hen* the construction was done at Hamlet Yard in the early nineties, '90, '91, and *the ballast came in, men came to me and started complaining about it due to the rough walking conditions,* the rock not being tamped down, *how it was bothering their legs and their feet.*

Q. Were there problems walking on the large ballast?

A. Yes.

Q. Would you explain to the jurors what those problems were?

A. Well, *it wasn't a stable walking area, and the rocks would roll under your feet. You had to be very careful when you were walking to not stumble and fall. The rocks would roll while you were walking on them.*

Q. Is there a difference between walking on the main line ballast and what's known as the walking ballast?

A. Oh, yes.

Q. Could you describe that for the jurors?

A. Walking ballast is tight. It doesn't give, and it's like walking on a sidewalk.

Q. *These complaints that you were getting, did you relay those to management?*

A. *Yes.*

(Emphasis supplied).

He described particularly the "tightness in your knees" from walking on the large ballast and his express communication of that problem to his superintendent.

A. You'd be tired, and *you could tell the tightness in mostly your knees.*

Q. *Did you relay these complaints to management?*

A. *Yes, sir.*

Q. *In particular whom?*

A. *The superintendent, who at that time was Mr. Watson.*

Q. Would that be one Butch Watson?

A. Yes.

(Emphasis supplied).

On August 21, 1992, Howe sent a written complaint to his local superintendent with a copy to the District Superintendent. He sent in another written complaint on October 19, 1995. It listed a number of "unsafe conditions reported at Hamlet Yard." Among those complaints was Item Number 5, which Howe described:

Q. And Number 5?

A. As always, *the large ballast needs to be removed.*

Q. *Did you request immediate attention to that?*

A. *Yes, I did.*

(Emphasis supplied).

When the problem remained unsolved, Howe wrote another letter dealing with large ballast.

Q. I'm going to show you what's been marked as Plaintiff's Exhibit # 4. *Do you recall that letter?*

A. Yeah.

Q. And *what's the problem there?*

A. *Ballast.*

Q. *What's the problem with the ballast?*

A. *Still got the big ballast there,* and they put the little ballast over it, and it didn't work.

Q. Read the second full sentence in the first paragraph.

A. *There is very large ballast in this area that needs to be removed* and replaced with walkway ballast.

(Emphasis supplied).

Howe also testified that on the yard bulletin board was a copy of a 1995 letter from the local yard superintendent to

both the Division Superintendent and the Division Engineer. That letter, Plaintiff's Exhibit 5, recited in part:

The following issue within the terminal at Hamlet needs your attention in order that we can *correct an ongoing,* (3 years) *issue* at Hamlet, *that may well fall into the safety category.*

*Even if it were not a "safety" item it is an issue that we must address from an ergonomic stand point and its relationship to our aging work force.* In light of the conductor-only jobs that are now in place at Hamlet it has mandated that my people now spend more working hours on their feet. My present assignment mandates that I am responsible for the safety, productivity, cost of operation of this terminal and I see this issue as a detriment to all of the above.

*We must address the issue of the big ballast in the yard "B" area,* especially in the areas of the trimmer crossovers and the departure yard ladder. *We have talked about this a number of times and still no solution.*

*Like many of our problems there is no easy fix.*

(Emphasis supplied).

## D. Relevance

 Among the duties of CSX was that of providing a safe work place for its employees. As we have discussed in dealing with the legal sufficiency of the evidence to establish causation, CSX, by its use of large or mainline ballast, failed to provide a safe and healthy footing for its employees to walk on. To establish some negligence in that regard on the part of CSX, Miller had to show foreseeability, to wit, that CSX was on notice that the use of large ballast was creating a footing problem for employees in the railroad yards.

The testimony of both Jenkins and Howe, particularly in their capacities as union representatives passing along workers' complaints to management, bore directly on that issue of foreseeability or notice. In the words of Rule 5–401, the testimony unquestionably had a "tendency to make the exis-

tence of" notice "more probable than it would be without the" testimony. The challenged evidence was relevant, by definition.

The caselaw cited by CSX is of little help to its argument. It quotes *Smith v. Hercules Co.*, 204 Md. 379, 385, 104 A.2d 590 (1954), for the unremarkable proposition:

> Evidence of other accidents, particularly where the circumstances are not identical, have little probative value and are calculated to prejudice the jury.

*Smith v. Hercules* is not at all apposite, in that it was a case dealing with a single physical accident at a precise moment in time and not with a pervasive and ongoing condition contributing to a slowly developing injury over a course of time. What is being examined on this contention, moreover, is not "evidence of other accidents" but evidence of other complaints.

*Locke v. Sonnenleiter*, 208 Md. 443, 118 A.2d 509 (1955), albeit cited by CSX, upheld the admission of evidence of prior accidents. Judge Hammond well stated the controlling legal principle.

> The rule followed by the majority of the cases is that if the evidence as to past accidents, tendencies or defects is *sufficiently relevant* and illuminating *because there is similarity of time, place and circumstance, it will be admissible*—not as direct evidence of negligence but to show the existence of a danger or defect in the character of a place, method or appliance and *to show knowledge or notice of the danger or defect on the part of the defendant* .... *Such evidence tends to show* the dangerous qualities of the thing or place, and *knowledge of these qualities on the part of the owner* or possessor.

208 Md. at 447–48, 118 A.2d 509 (emphasis supplied). *Locke v. Sonnenleiter* resembles the case before us in that the prior accidents in that case confirmed the law of physics that was pertinent to the accident on trial. If heavy iron bars are placed asymmetrically on the edge of a table instead of symmetrically in the middle of the table, there is a tendency for the table to topple over and for the iron bars to fall on the floor. The probity of those prior accidents was not in any way

diminished because, in the incident there being tried, the iron bars fell on the plaintiff's foot, whereas in the earlier incidents they fell on something else. They were offered to prove the universal consequences of an unstable load. See also *Southern Management Corp. v. Mariner*, 144 Md.App. 188, 192–95, 797 A.2d 110 (2002).

In challenging the relevance of the two videotaped depositions, CSX also seizes on the fact that Jenkins's knee injury, though attributable to walking on mainline ballast, resulted from a slip and fall, whereas Miller's knee injury was the product of progressive osteoarthritis. That difference does not erode the foreseeability of harm by CSX. *Elston v. Union Pacific Railroad Co.*, 74 P.3d 478, 482 (Colo.App.2003), holds squarely:

Foreseeability does not require the employer to have anticipated the plaintiff's injury in the precise manner in which it occurred. It is sufficient if the employer could reasonably foresee that *an* injury might occur. In a close case, the FELA action should be allowed to proceed to trial.

See also *Gallick v. Baltimore and Ohio R.R.*, 372 U.S. 108, 118, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963).

In groping for a critical distinction, CSX also makes much of the fact that the Baltimore yards are not the yards in Jacksonville or the yards in Hamlet, North Carolina. Indeed, they are not. CSX argues:

It is equally clear that the circumstances testified to by Howe and Jenkins, were not similar, much less identical to facts of the instant case. First and foremost, *the railyards at issue in this matter are in Baltimore and Baltimore only. Neither Howe nor Jenkins has any knowledge,* personal or otherwise, *as to the conditions of the railyards in Baltimore,* Maryland. In fact, *both* of these gentlemen *admit that they have never even seen the Baltimore railyards.* The conditions of the other yards are completely irrelevant and would only distract the fact finder.

(Emphasis supplied).

On the issue of foreseeability, however, CSX is a gargantuan corporate entity, with numerous antennae reaching down

into far-flung rail yards in far-flung places. The messages received through these antennae, however, travel up to a single corporate brain. If CSX was aware that walking and running and jumping on large ballast might be, over time, injurious to the feet, ankles, legs, and knees of its employees, it matters not that that awareness came not from Baltimore but from Timbuktu or Tierra del Fuego. CSX was alert to the danger wherever such ballast may have been laid.

In looking at diverse situations involving dozens of factors, some similar and some dissimilar, a relevancy assessment requires separating the wheat from the chaff. In terms of notice to CSX, the dissimilarity between Baltimore and Jacksonville is irrelevant. The dissimilarity between Donald Miller's osteoarthritis and Robert Jenkins's slip and fall is irrelevant. What is relevant is the similarity of the physiological or anatomical phenomena of employees' stepping and jumping on large ballast thousands and then tens of thousands and then hundreds of thousands of times, wherever that ballast may be. What is relevant is the similarity in the reaction of the human ankle, the human leg, and the human knee to hundreds of thousands of wobbles, wherever those wobbles take place. The knee reacts to a wobble in Baltimore even as it does in Florida. Jenkins's experience is a similarity, not a dissimilarity. In looking at the myriad of factors, those that are relevant on this issue are indistinguishable. Those that are distinguishable, such as time and place, are in this case merely coincidental and irrelevant.

Although the primary purpose for which the videotaped depositions of Jenkins and Howe were offered was to prove foreseeability or notice and the primary relevance of their testimony was, accordingly, to prove such notice, CSX, as an artful dodger, tries to shift, very adroitly, the terms of the debate and to argue the irrelevance of the testimony to prove causation. We are not going to permit our focus to drift. The primary function of the testimony under discussion was to prove foreseeability, not causation. Argument appropriate in the one compartment must not be permitted to leak into the other compartment.

### E. Hearsay

CSX also complains that the testimony of both Jenkins and Howe was replete with hearsay and that it could not cross-examine the sources of the complaints about large ballast. Hearsay, of course, is an out-of-court assertion offered in court for the truth of the thing asserted. In this case, both Jenkins and Howe heard and then passed on to management numberless complaints from unnamed declarants at unspecified times. Were such complaints hearsay? Maybe. Maybe not. We cannot know, of course, until we know the purpose for which those declarations of complaint were offered.

In this case, it is clear that they were offered to prove that CSX was on notice that walking on large ballast was injurious to its employees. What the employees asserted in those grievances, therefore, was not offered for the truth of the things asserted. The grievances were offered only to prove that CSX, from Jenkins and Howe, heard those complaints. That, of course, is a textbook example of non-hearsay; it is quintessential non-hearsay.

It is simply to recite an ABC of evidence law to quote *McCormick on Evidence* (3d Cleary ed.1984), 733–34:

> When it is proved that D made a statement to X, with the purpose of showing the probable state of mind thereby induced in X, such as being put on notice or having knowledge, . . . the evidence is not subject to attack as hearsay.

Substituting more pertinent for abstract terms, that statement then becomes:

> When it is proved that [Jenkins or Howe] made a statement to [CSX's representative], with *the purpose of showing the* probable *state of mind* thereby *induced in [CSX], such as being put on notice* or having knowledge, . . . *the evidence is not subject to attack as hearsay.*

(Emphasis supplied).

In ruling on the admissibility of evidence, broad discretion is vested in the trial judge and appellate courts will not interfere with that exercise of discretion except in cases of clear abuse.

In admitting the videotaped depositions of Jenkins and Howe, Judge Nance, we hold, did not abuse that broad discretion.

## A Parthian Dart

At the tail end of a 44–page brief, CSX throws in a single unilluminating eight-line paragraph challenging the admission into evidence of "internal memoranda of CSX regarding conditions of various CSX railyards." It is a classic Parthian dart.[3] We are not told how many such memoranda there may have been. We are neither given nor referred to the text of any of the memoranda. No case nor statute nor rule of court is mentioned. There is no legal argument made. There are, however, at least three conclusory allegations: 1) that the memoranda were introduced "without the support of any testimony;" 2) that they "contain vague and conclusory statements;" and 3) that "no affirmative testimony that would have explained the content or given specific conditions or injuries were presented to the jury."

Before answering such a throwaway contention, we would 1) have to search this 1000–page record extract to see if any facts could be culled from it to support any of the bald conclusions and 2) have to construct an argument for CSX before then proceeding to try to deconstruct it. At the end of the day, we are not inclined to undertake such a project. If CSX wanted a weightier resolution of the issue, it should have mounted a weightier contention. Gravitas begets gravitas.

\* \* \* \* \*

This, then, is a FELA case.[4] Hopefully, the *terra* is no longer completely *incognita*. In any event, we affirm the judgment of the Circuit Court for Baltimore City

---

3. In classical antiquity, the Parthians lived on the northwestern edge of the Iranian plateau and were legendary as light cavalry. They were noted for being able, when fleeing an enemy, to turn in the saddle a full 180 and to let fly a parting arrow at the pursuing foe. Even though the Parthian arrow or Parthian dart did not win battles, it enjoyed wide renown as a harassing tactic.

4. The 65–year trend in FELA litigation has been aptly summarized by *Prosser and Keeton on Torts* (5th ed.), § 80, pp. 578–79:

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

The history of the Federal Employers Liability Act since [1939] has been one of *gradual but persistent liberalization in the direction of allowing the plaintiff to recover whenever he is injured in the course of his employment, as under a compensation act.* ... While it is still undoubtedly true that there must be some shreds of proof both of negligence and of causation, and that "speculation, conjecture and possibilities" will not be enough, *there appears to be little doubt that* under the statute *jury verdicts for the plaintiff can be sustained upon evidence which would not be sufficient in the ordinary negligence action.*
(Emphasis supplied). The "best summary" award goes perhaps to *Aparicio v. Norfolk & Western Railway Co.*, 84 F.3d 803, 810 (6th Cir.1996), as it tells us:
[A] Federal Employers' Liability Act plaintiff [is required] to present more than a scintilla of evidence in order to create a jury question on the issue of employer liability, *but not much more.*
(Emphasis supplied). In this case, there was much more.